## CHARLESTOWN.

### SEABRIGHT v. SEABRIGHT et al.

Submitted June 4, 1886.—Decided September 18, 1886.

1. The principles, which control the mode of proceeding, when the accounts of a personal representative settled *ex parte* returned and recorded in the proper court are to be surcharged and falsified, are the same as those, where a stated account is to be surcharged and falsified, except when there has been fraud in making the settlement, which is the basis of the stated account. (p. 432.)

2. The bill in such case must set forth one or more items, whereby the plaintiff seeks to surcharge or falsify such account or *ex parte* settlement, unless there be errors or mistakes on the face of the account or of the *ex parte* report or settlement filed with the bill ; such apparent errors need not be specified in the bill. If the bill is defective in these respects, it should be dismissed unless amended. But if such bill be not demurred to, and the court should improperly make a general order of reference directing a settlement of the accounts of the personal representative, instructing the commissioner to regard the *ex parte* settlement as *prima facie* correct subject to be surcharged and falsified by either party, and this be legally done by the plaintiff, while the cause is before the commissioner, and a report be accordingly made, such cause ought not to be afterwards dismissed for such defects in the bill.   (p. 440.)

3. When an order of reference is made in any suit to surcharge and falsify the *ex parte* settlement of a personal representative, it should be a general order of reference, such as is above named, and not a restricted order of reference confined only to those items, which have been specified in the bill as the subjects of sur charge and falsification.   (p. 441.)

4. If the plaintiff does not wish to be confined to those items of surcharge and falsification named in the bill and the errors on the face of the *ex parte* settlement, he ought properly to file with the commissioner a written specification of any additional items of surcharge or falsification, on which he proposes to rely, so as to give the personal representative information as to all the items of the *ex parte* settlement, which it is proposed to surcharge or falsify. The personal representative need file no written denial of these grounds of objection alleged there by the plaintiff ; but they shoud be regarded by the commissioner as denied by him, unless he admits their justice.   In like manner the personal representative should be permitted by a written statement to surcharge or falsify the *ex parte* settlement, and it should be regarded, just as the written specification of errors filed with the commissioner by the plaintiff is regarded.   (p. 441.)

5. If the plaintiff or defendant fails to file such written specifications of error with the commissioner, but the parties proceed to take evidence with reference to such additional errors, as if such written specification of error had been filed, or if such evidence had been taken without objection in the cause itself either before or after the order of reference, and it is apparent, that neither party has been taken by surprise, and the commissioner in his report corrects such errors, and his report is not excepted to, because such written specifications of error were not filed, the court should act upon such report, as if such written specifications of error had been filed with the commissioner, unless it be proven to the court,

that in point of fact one of the parties was surprised by the failure of the other to file such written specification of error. In such case and not otherwise the court should because of such failure to file such written specifications refer the cause back to the commissioner to inquire into such alleged errors. But if exceptions are filed in proper time to such report, because no such written specification of errors were filed, the court may either refer the cause back to the commissioner for this cause only without examining the report, or it may inquire, if it think proper, into the question, whether the exceptor has in point of fact been surprised or not, and, if it find that he has not, may act upon the report, as though the proper written specifications of error had been filed with the commissioner. (p. 442.)

6. If there be no apparent errors on the face of the *ex parte* settlement, and the answer denies all errors alleged in the bill and makes no statements showing, that there are no other errors in the *ex parte* settlement, and the plaintiff fails to produce evidence establishing any error in the *ex parte* settlement, the court should not refer the cause to a commissioner but should dismiss the bill; but this Court would not reverse a decree, which was properly made on a commissioner's report, for the sole reason, that the cause in the condition, in which it was, when the order of reference was made to the commissoiner, ought not to have been referred to him. (p. 443.)

7. In such a suit the executor or residuary legatee can not demur to the bill, because a specific legatee was improperly made a co-defendant. (p. 446.)

8. Though an interested party files before a county court an exception to an *ex parte* report and settlement of an executor's accounts, and, before the court acts upon such exception, withdraws it, and the *ex parte* settlement is then confirmed by the county court, such party may nevertheless file his bill to surcharge or falsify such *exparte* settlement because of this error only. (p. 447.)

9. If in answer to a bill of this sort the executor claims, that just prior to his death the testator gave him a large number of bonds and notes, which he admits had been the property of the testator prior to such alleged gift, the burden of establishing such claim is on the executor. (p. 450.)

10. A cause made by an amended bill filed at rules must be regularly matured for hearing, just as the cause made by an original bill must be; but if such amended bill was utterly useless and in no manner could affect the the final decree, this Court would not reverse such decree, because such useless amended bill was not matured before the final hearing of the cause. (p. 454.)

11. Within the meaning of the act of March 27. 1882, ch. 160 §23, being an amendment of ch. 130 sec. 23 of the Code of W. Va., a party testifies in his own behalf, when his deposition is used in a chancery cause, not at the time, when it was actually taken ; and though such witness was competent to testify, when his deposition was taken, his evidence ought to be excluded, if he was incompetent to testify, when such deposition is proposed to be used in the cause.  (p. 460.)

12. This statute as well as the sec. 25 of ch. 130 of the Code in providing, that no party as to certain transactions shall be examined *against* certain other persons, does not mean by *against* on opposite sides of a suit but as having opposing interests in the suit whether on the same side as co-plaintiffs or co-defendants or on opposite sides as plaintiffs and defendants.  (p. 465.)

13. In designating the persons, against whom a party to a suit shall not testify in his own behalf as to certain transactions, by the words *next of kin* the law does not intend simply the nearest blood-relations of the decedent but any distributee, as for instance the decedent's widow.  (p. 465.)

14. In the meaning of ch. 160 of Acts of 1882 by the word *survivor* used to designate the persons, against whom an interested person shall not testify in his own behalf as to certain transactions, is intended any person, who by reason of his surviving the deceased would become as such survivor interested in the subject of controversy, as for instance a widow, who claimed as distributee a share of her husband's estate, when the question in controversy was, whether her husband in his lifetime had given away a portion of his personal property to one, who was his executor, or whether such personal property was her husband's at the time of his death.  (p. 467.)

15. The burden of proving a gift of personal property by a decedent is much heavier on the claimant, when the alleged gift is a gift *causa mortis* than when the gift is one *inter vivos.*  When the gift claimed is a gift *causa mortis.* it must be proven by strong and clear evidence.  (p. 470.)

16. Though a bond or note be delivered to a person, and the donor signs an endorsement on it in these words : " For value received I assign all my right to title and interest in this bond or note to donee" naming him ; yet such gift may be shown by the surrounding circumstances to have been a gift *causa mortis* and not a gift *inter vivos.*  (p. 475.)

17. If such a gift is of a very large amount and nearly the whole of the donor's personal estate, whether the gift be *inter vivos* or *causa mortis,* the court would require the most clear and satis-

factory proof of the gift as well as of the delivery of the bond or note ; and it would require much less evidence from the surrounding circumstances to show, if the gift was established, that it was a gift *causa mortis* and not a gift *inter vivos.*   (p. 481.)

*W. P. Hubbard* for appellant.

*B. B. Dovener* for appellee.

Statement of the case by Green, Judge:

This is a chancery suit instituted in 1876 in the circuit court of Ohio county by Louisa Seabright, the widow of Louis Seabright, against Charles W. Seabright, his executor, and his residuary legatees to surcharge and falsify three *ex parte* settlements of his executorial accounts, because in those accounts the executor was not charged with certain bonds and notes given to Louis Seabright in his lifetime, which represented the purchase-money of several parcels of land which he sold.   The facts appearing from the pleadings, exhibits and depositions filed in the cause are as follows:

In October, 1869, one Hadley recovered a judgment against Louis Seabright in the circuit court of Marshall county for $3,651.51.   During the years 1869, 1870 and 1871 Louis Seabright sold a large amount of his real estate to sundry persons for considerations aggregating more than $30,000.00, on credits ranging from one to sixteen years with interest from the day of sale, securing the purchase-money evidenced by bonds or notes made payable to his then wife by deeds of trust on the lands sold.   From this judgment against him he obtained a writ of error and *supersedeas* from this Court who affirmed the judgment.   The bill alleges that these sales of his real estate were made by Louis Seabright to avoid the payment of this judgment, which it was anticipated would be affirmed.   But the answers deny this.   And it is immaterial what was his motive in selling these lands and taking these bonds and notes payable to his wife, as she died in 1872 before her husband Louis Seabright, intestate and childless, and he became as her sole distributee the equitable owner of all these bonds and notes payable to her, though there was no administration on her estate.   And in addition to these lands Louis Seabright owned then and at the time of his death other real estate exceeding $20,000.00 in value, and

out of the sales of it this Hadley judgment has been paid certainly to a large extent and probably in full since the death of Louis Seabright. Very shortly after the death of his said first wife Louis Seabright in June, 1872, married the plaintiff in this cause. Before his marriage to her but after the death of his first wife for some reason not explained he gave to her for safe keeping these land-bonds and notes, which were made payable to his deceased wife, and she by his direction deposited them for safe keeping in one of the Wheeling banks. A number of these bonds amounting to several thousand dollars had been previously collected, and the amount of these bonds deposited in the bank was probably about $22,000.00 of principal. He subsequently withdrew these bonds from the bank and deposited them with Charles W. Seabright, his half brother, as collateral security to indemnify him against loss by reason of his having gone security for him, Louis Seabright, in the *supersedeas* bond given on his obtaining a writ of error to this Hadley judgment. Subsequently, on January 16, 1873, being in bad health he appointed Charles W. Seabright his attorney in fact to collect for him these bonds and notes and all the debts due to him and out of the proceeds to pay all the debts he owed, and he so advertised in a Wheeling paper directing his debtors and creditors to settle with Charles W. Seabright, his attorney in fact.

Louis Seabright, who was dissipated, and his wife had quarrelled and she had brought a suit for a divorce, which was pending, when he died February 21, 1873. Very shortly after this marriage in June, 1872, they separated and never afterwards lived together. After their separation Louis Seabright rented his residence in Marshall county, West Virginia, to Henry Weidebusch, who kept it as a boarding-house or hotel, and Louis Seabright boarded with him. While thus boarding with Weidebusch, probably about February 1, 1873, Louis Seabright was taken sick probably as the result of his dissipated habits. He soon became very feeble and low and was not expected to live. While in this condition he made a will, the contents of which do not appear, except that he left by this will some small legacies to his wife's relatives and did not mention in his will these land-

bonds and notes, which he had placed in the hands of his half brother, Charles W. Seabright, to collect for him as his attorney in fact. He subsequently got better; and when this will was read over to him, he said, it did not suit him, and he would make another, at the same time saying he would assign these land-bonds and notes to Charles W. Seabright and to Henry Seabright, who was a full brother of Louis. He said this to Weidebusch on February 12, 1873, at which time he had these land-bonds and notes in his possession, Charles W. Seabright having returned them to him several days before, it is presumed, because of a conversation which Louis had with him as deposed to by Charles, in which Louis told him, he wanted to assign these bonds and notes over to him and to Henry Seabright his brother and asked him to find some one, who could make this assignment in a lawful manner. In accordance with this request Charles W. Seabright found one Benno Kammer, who was a justice of the peace. He also deposed, that Louis Seabright at the time, I presume, that this conversation was held with Charles, said, that his wife Louisa had treated him so bad by driving him out of his own house, that she was not entitled to anything but one-third of his real estate, which the law compelled him to give her.

On the morning of February 13, 1873, Louis Seabright, who had some days before that been quite ill, was much better; and when Weidebusch brought his breakfast up to him in his room, he had gotten up and was dressed and sitting by a table. He appeared cheerful that day and did not seem very sick, though the doctor attended him because of his sickness, as he had done every day from the time he was taken sick, and he continued his attendance every day thereafter, till he died on February 21, 1873. On the morning of February 13, 1873, Louis Seabright asked Weidebusch to go and bring to him Charles W. Seabright, Henry Seabright and Benno Kammer, as he wanted to have some business done. He accordingly saw Charles W. Seabright and Kammer, and they came to see Louis Seabright. Charles W. Seabright did not see Henry Seabright and ask him to come as requested, because he was not at home. When they came, Louis Seabright asked Weidebusch to bring them to his

room and he did so.    He also at the request of Louis brought a pen; and by Louis's direction Benno Kammer wrote with a pen, which he carried about him, on each of these land-bonds and notes an assignment of it to Charles W. Seabright and Henry Seabright, and Louis Seabright signed his name at the foot of each assignment.    Louis Seabright, who had all these bonds and notes in his possession, handed them one at a time to Benno Kammer, and he wrote the assignment upon it and handed it back to Louis Seabright, who was sitting at the same table, and he would sign the assignment on the back of the bond or note and hand another one to Benno Kammer.    There were probably upwards of forty of these bonds and notes, and on each of them was written an assignment, which was signed by Louis Seabright.    The assignment and signature on each was in these words : "February 13, 1873.    For value received, I hereby transfer and assign all my rights, title and interest into this note to Henry Seabright and Charles W. Seabright.    LOUIS SEABRIGHT."

There were present, at the time these assignments were written and signed besides Justice Kammer, Charles W. Seabright and Weidebusch.    Kammer's deposition was never taken, and he is now dead.    Whether he died before the institution of this suit or not does not appear.    Weidebusch only testified to the facts above stated, but he did not testify to any delivery by Louis Seabright of any of these notes or bonds to Charles W. Seabright, after they were so endorsed to Charles W. Seabright and Henry Seabright; nor was he asked any questions as to whether they were delivered by Louis Seabright to Charles W. Seabright.    But · Charles W. Seabright testified that "After signing the assignment on the back of these bonds and notes Louis Seabright handed them to him and told him they were his Charles W. Seabright's and Henry Seabright's.    And he then told Benno Kammer he wanted him to write his will when he and Weidebusch left the room."    The plaintiff's counsel excepted to this statement of Charles W. Seabright as a personal communication had by him with Louis Seabright, deceased, which he was incompetent to testify about.    Weidebush testifies, that the will was written shortly after these assignments were written, the same day.    At Louis Seabright's request

he went for witnesses to attest his acknowledgment of the will. It was attested the same day by Benno Kammer and four other witnesses. Louis Seabright died about a week afterwards. This will was proven and admitted to record on July 25, 1873; and Charles W. Seabright qualified as executor, the penalty of his executorial bond being $5,000.00.

By this will he bequeaths two legacies of $500.00 each to Henry Wiedebusch and William Juergens, a son of a deceased sister; all the residue of his property real and personal he devised and bequeathed to Henry Seabright, Charles W. Seabright and Louisa Nolte, his sister; and Charles W. Seabright was appointed executor. The making of the will as well as the assignment of the land-bonds and notes was not kept a secret; and both were known to Louisa Nolte. But it seems, that the plaintiff, Louisa Seabright the widow, did not know of this alleged assignment of the land-bonds and notes, till some time after the original bill was filed in this cause. The aggregate of these land-bonds and notes exceeded in amount $22,000.00 exclusive of interest; and they were all the bonds or notes, which Louis Seabright had for lands sold in his lifetime. The other land-bonds or notes, which he had, having been collected by or for him prior to his signing these assignments. His personal estate, principally household furniture, was appraised after his death at $366.60. The only bonds or notes, which were produced by the executor to be inventoried as a part of the estate, were four small due bills amounting in the aggregate to $177.42 and a note of one Bremmer in the hands of counsel at the time of his death, which was for $500.00, whether it was of any value does not appear. His real estate consisted of sixteen small houses appraised in all at $5,000.00, a tannery appraised at $5,000.00, a farm in Marshall county appraised at $4,000.00 and his home-place appraised at $7,700.00, making the total appraised value of his real estate $22,700.00.

No authority is conferred by this will on the executor to sell the real estate of the testator; but the commissioner in his report of one of the *ex parte* settlements, which this suit was brought to surcharge and falsify, says: "The executor represents to your commissioner, that the personal estate of the testator was not sufficient to pay the debts, and that the

devisees in the will agreed and sold the real estate of said testator, and also assigned the sum in gross to the widow in lieu of her dower therein, the proceeds of such sales to be paid to the executor, and he to apply the same to the payment of said sum to the widow, and then to the debts against the estate and the legacies from the estate." And the executor is charged in these *ex parte* accounts accordingly with purchase-money paid to him on this real estate sold and credited with the sum paid to the widow and the legacies paid, and is allowed a commission on all sums received including the receipts from the sales of land. In one of the answers it is stated that these sales of lands amounted to about $18,000.00. But it would seem that a part only of this had been paid to the executor. No evidence however has been taken in reference to these matters. Nor has the agreement among the devisees of Louis Seabright referred to above been filed, nor its execution proven or admitted.

The land-bonds and notes, the principal of which exceeded $22,000.00, were after the death of Louis Seabright divided equally between Charles W. Seabright and Henry Seabright, when they could be so divided, a bond or note of the same amount being taken by each of them, and when this could not be done, and the bond or note was collected, the amount in money collected was equally divided between them. But this was not known to the plaintiff, Louisa Seabright, who, when she filed her original bill, did not know, that any assignment of any of these bonds or notes had been endorsed thereon by Louis Seabright. She filed her original bill in the circuit court of Ohio county, in which county the executor, Charles W. Seabright, resided.

This bill was filed at July rules, 1876, and omitting what is irrelevant it states, that the plaintiff is the widow of Louis Seabright, who died February 21, 1873, leaving a will, an attested copy of which is filed as an exhibit, and the substance of which has been stated above. The bill then alleges, that Louis Seabright in his lifetime sold various tracts of land and took deeds of trust to secure the deferred payments for said lands; and setting them forth she files the deeds and deeds of trust, which show accurately the amount originally due on the bonds and notes for the purchase-money secured by

these deeds of trust. The bonds and notes are fully described in the deeds of trust. The bill charges, that all these notes and bonds representing the purchase-money of these lands, whether secured by deeds of trust or not, or if not all at least as many of them as amounted to not less than $23,000.00, were placed by Louis Seabright in the hands of Charles W. Seabright as his agent, and Louis Seabright advertised in the Wheeling Register January 16, 1873, that Charles W. Seabright was his attorney in fact to collect all his debts and pay whatever was due from him; that Charles W. Seabright at the death of Louis Seabright had in his possession all of said bonds and notes belonging to Louis, which Louis had left with him as his agent and attorney in fact, and has them now, or he has distributed them in some proportion among the devisees and legatees other than the plaintiff, and has failed to account for them as executor in his *ex parte* settlement of his accounts; and that with the interest on them they would now amount to $30,000.00, which has not been accounted for. He files as an exhibit to show this an *ex parte* settlement dated September 22, 1874, which was confirmed, as the exhibit shows, by the county court of Marshall at the April term, 1875. Omitting the account the following is the report of the commissioner:

"Your commissioner reports to court that on September 22, 1874, Charles W. Seabright, executor of the last will and testament of Louis Seabright, deceased, exhibited before your commissioner a statement of all the moneys which he had received or become chargeable with or had disbursed since the death of his testator to this date, together with vouchers for such items of disbursements marked "V," and was qualified to such as are marked "Q" in said settlement. Your commissioner embraced said executor in the list of fiduciaries whose accounts were before him for settlement, which was posted at the front door of the court house of Marshall county, on the first Monday of this month (September 1874), fixing the time for stating said account on September 1874, at the clerk's office of the circuit court of Marshall county, being more than ten days from the time of so posting, and then made and completed the foregoing account of said Charles W. Seabright, executor of the last will of

Louis Seabright, deceased, and find his receipts to amount to $11,406.53 and his disbursements amount to $10,917.91, leaving a balance of $511.38 due from the said estate to said executor. The items of disbursements are chiefly supported by proper vouchers. The executor represents to your commissioner that the personal estate of his testator was not sufficient to pay the debts, and that the devisees in the will agreed and sold the real estate of said testator, and also agreed the sum in gross to the widow in lieu of her dower therein, the proceeds of such sale to be paid the executor, and he to apply the same to the payment of said sum in gross to the widow in lieu of dower, and then the debts against said estate and the legacies from this estate of the case of the executor is charged in said account with what purchase-money of the real estate he has received and credited with the payment of the same in gross to the widow.

"All of which may be seen by reference to said account, leaving the balance as aforesaid. All of which is respectfully submitted. A large portion of the purchase-money of said real estate is in arrears and unpaid, and some little of the personal estate."

The bill alleges that no part of the sum of $11,406.53 charged in this report as received by the executor arose from the collection of any portion of said land-bonds and notes, which had been placed in the hands of C. W. Seabright as agent and attorney in fact of Louis Seabright, but that it arose principally from the sale of real estate since the death of Louis Seabright.

The next *ex parte* settlement was made, the bill says, and reported by the commissioner July 19, 1875, and an attested copy of it is filed as an exhibit, from which it appears, that it had not been confirmed. The receipts, as the account on its face shows, which amounted since the last report to $5,583.82, were from rents of land and from sales of land since Louis Seabright's death. The payments amounting to $3,671.91 were debts of the estate. A statement is added showing the payment by the executor of two legacies of $500.00 each named in the will. No objection to this *ex parte* settlement is stated in the bill; but it is correctly claimed, that it shows, that no part of the $5,583.82 received since the

last account was received from any of said land-notes and bonds, which had been left with Charles· W. Seabright.

The last *ex parte* account, the bill states, was made and report dated May 10, 1876, and by it there appeared to have been received since the previous account $638.25, but no part of this was from any of the land-notes and bonds. A certified copy of this account and report is filed as Exhibit F., but it is not referred to in the bill. This exhibit, if it could be looked at, shows, that nothing whatever had been received by the executor since the previous settlement, and that the $638.25 alleged to have been received was really the amount of the disbursements, and that there were included in it sums paid to the widow on her dower. But this report and account had not been confirmed by the county court of Marshall. The bill states then, that Henry Seabright had died and Mena Seabright, his widow, was his administratrix. The bill claims, that the plaintiff as the widow of Louis Seabright is entitled to one third of his personal estate, asks that C. W. Seabright as executor of Louis Seabright and in his individual character, Louisa Nolte and Mena Seabright, administratrix of Henry Seabright, and William Juergens might be made defendants and be required to answer this amended bill according to the statute; but no discovery on oath is required of them or either of them. The bill then concludes as follows:

"And your oratrix prays that upon the hearing of her case the court would order and decree that the said C. W. Seabright, as such executor, may be compelled to account for the said $30,000.00 thus received or distributed, and so far as the same has been distributed to the said defendant and to the said Henry Seabright in his lifetime, they and each of them may be compelled to bring the sum thus received by them and each of them into court, or account for the same, so that your oratrix may receive the full one third of the same, according to the said will, and that the said accounts of the said executor be surcharged and falsified in respect to the said $30,000.00, and such other and further relief as your oratrix may be entitled to or the court may judge right and proper."

This bill was afterward, by the plaintiff dismissed as to William Juergens, he being but a specific legatee. It was also demurred to by C. W. Seabright and Louisa Nolte, and

the demurrer was overruled on July 14, 1877, and the defendants were granted forty days within which to file their answers.

On November 6, 1877, the defendants, C. W. Seabright, Louisa Nolte and Mena Seabright, administratrix of Henry Seabright, severally filed their answers, to which the plaintiff replied generally.  The answers were substantially alike; and the material allegations in them were those set out in the statement heretofore made of the facts in the cause, except that in describing the transactions,which took place February 13, 1873, they say that Louis Seabright being in feeble health and about to make his will, before the same was made, endorsed, delivered, transferred and assigned all his right, title and interest to Henry Seabright and Charles W. Seabright in writing and signed his name thereto on the back of these notes which Charles W. Seabright had in his possession, and all of which he had returned to Louis Seabright; and that he, Charles W. Seabright, accounted with him for all the moneys, which he had collected for him in his lifetime.  These answers also allege, that the plaintiff knew of the gifts of these bonds and notes by Louis Seabright to Henry and Charles W. Seabright.  These answers were all sworn to by the respondents respectively.  On the filing of these answers and general replication to them this decree was entered November 17, 1877 :

"This case came on to be heard this 17th day of November, 1877, upon the bill of the plaintiff and the exhibits thereof, the several answers of Charles W. Seabright, Louisa Nolte and Mena Seabright, as administratrix of the estate of Henry Seabright, deceased, and the plaintiff's general replication thereto.  On the motion of the plaintiff this case is referred to one of the commissioners of this court to examine the accounts heretofore filed of the said estate, and ascertain if the said executor, C. W. Seabright, is liable to be charged with said several sums of money, or the notes and deeds of trust in the Exhibit "B." mentioned, or any or either of the said sums of money or notes or deeds of trust, and report, if he shall so find the said C. W. Seabright liable, for how much he is liable to account for, and how much his said accounts by reason thereof should be surcharged.  Before the taking of the said

account, the said commissioner shall give twenty day's personal notice of the time and place of taking the same on C. W. Seabright, Louisa Nolte, Mena Seabright, administratrix of the estate of Henry Seabright, deceased, and as to the said William Juergens this suit is here dismissed; that the said commissioner may, at the request of either party, report any other matter relating to the same."

Subsequently the cause was revived as to Adam Ackerman administrator *de bonis non* of Henry Seabright, and he filed an answer substantially the same as that filed by the previous administrator, and this answer was replied to generally, and a number of depositions were taken and with sundry exhibits filed in the cause. These depositions and exhibits together with the admissions and statements in the answers prove, that the substantial facts in this cause are those hereinbefore stated.

On March 25, 1879 the commissioner reported as follows:

"I have examined the papers in the cause and the accounts heretofore filed of the said estate by the said executor, Charles W. Seabright, and I find that the said executor is liable to be charged with the following amounts or notes and the deeds of trust securing the same: The notes of Henry Goetz, amounting to $1,200.00; the notes of B. Juergens, amounting to $1,200.00; the notes of Carl Stuntz, amounting to $450.00; the notes of John Smith, amounting to $400.00; the notes of Francis Gollner, amounting to $7,500.00; the notes of William P. Meyers, amounting to $8,666.61; the notes of George Hooth, amounting to $700.00; and the accounts of the said Charles W. Seabright, executor, are to be surcharged to the said amounts. The above are the notes assigned February 13, 1873, by Louis Seabright to Henry Seabright and Charles W. Seabright, and claimed by them as a gift from the said Louis Seabright. The Francis Gollner notes are sixteen in number, running from one to sixteen years, at $500.00 each, at three per cent. interest. The first was paid, probably, to Louis Seabright during his lifetime, which would leave

| | |
|---|---:|
| Notes to the amount of............................ | $7,500 00 |
| Interest on payments to March 1st, 1879 ............ | 525 00 |
| The Wm. P. Meyers notes amount to................... | 8,666 66 |

| | |
|---|---|
| Interest from maturity ........................ ... ................... | 600 00 |
| The notes of John Smith amount to.... .. .... ............ | 400 00 |
| Interest    ........ ...    ....    ... .... ............. | 90 00 |
| The notes of George Hooth amount to ................. | 700 00 |
| Interest ......... .................. .... ...... ... | 240 00 |
| The notes of Carl Stuntz amount to............... ....... | 450 00 |
| Interest  ..    ....    ....... ...... ............ ... | 135 00 |
| Notes of Juergen & Goetze amount to ..... .......... . .... | 2,400 00 |
| Interest.................. ............ .... ............ ... ... | 720 00 |

"The above notes are more particularly described in the deeds of trust filed as exhibits among the papers of the cause, and there is but little additional proof in regard to the same, and errors in the calculations, if any, can be rectified when the main question settled is as to whether the said executor is to be charged with any of said notes or not. It does not appear very plainly when all of the notes commenced to bear interest, and I fixed upon February 13, 1873 where the time was not definitely fixed.

"I find and so report that all of the above notes belonged to the estate of the said Louis Seabright, deceased, and have not been returned by the executor nor accounted for in his settlement; and further, that the above mentioned notes *were not given* or presented to the said Charles W. Seabright and Henry Seabright as claimed by them in their answers."

Various exceptions were filed to this report by the defendants; but it is deemed unnecessary to set them out, as the court by a decree entered May 12, 1879, without acting on these exceptions on the motion of the defendants entered a decree re-committing the cause to the commissioner to re-state the accounts with directions to report the testimony and evidence, on which he may base his report. This second report he made and filed June 30, 1879. He therein repeats as his present report *verbatim* the report, which he had made March 25, 1879, and which has been above stated at length. He then as required assigns the grounds, on which he reached these conclusions, which were the pleadings, exhibits and depositions, which had been taken and filed in the cause, no testimony having been either taken before him as commissioner or offered except that, which had been filed in the cause. I deem it unnecessary to give his reasons for reaching his conclusion, and the facts proven by the evidence filed in

the cause, and on which he acted, have been already stated at length.

To this report Charles W. Seabright filed the following exceptions:

"1st. Because the commissioner considered as evidence in making up his report a paper not properly proved, purporting to be a copy of report of the appraisers of the estate of Louis Seabright, a copy of deed of release of C. W. Seabright to Franz Gollner, a copy of deed of trust of Franz Gollner and wife to C. W. Seabright, trustee, said papers never having been filed in this cause, and not being proper evidence and admissable before said commissioner; said papers are marked "X," "Y" and "R," respectively, and returned by said commissioner with the papers in the cause, said papers not having been referred to him.

"2d. Because proper service was not made as directed by the order of submission entered on May 12, 1879, on the defendants of the taking of said account.

"3d. Because said commissioner having found from the evidence that Louis Seabright, deceased, did in fact intend to make said notes in the bill mentioned and asked to be surcharged, he should have reported that he found that the executorial account should not be surcharged in any amount whatever.

"4th. Because the conclusions in said report as well as the said report is contrary to the law and the evidence legally before said commissioner.

"5th. Because the commissioner should have reported the notes mentioned therein as the individual property of C. W. Seabright and the estate of Henry Seabright, deceased.

"6th. Because the notice of the taking of the account is defective and insufficient and matters were reported not directed by order of reference.

"7th. Because, even if the executorial account is to be surcharged, the commissioner reports a greater sum than he should have reported.

"8th. Because the commissioner considered the bill as evidence, which was improper."

Before this report was acted upon, nearly two years after it was made, on June 3, 1882, the following order was made:

"This day came the parties, by their attorneys, and the said C. W. Seabright, in his fiduciary capacity as well as his individual character, files his petition and the notice on which the same is based, asking permission to take further testimony in his behalf herein, and the court being of opinion that he ought to have an opportunity to take the same, grants him leave to take further evidence in his behalf in this cause; and thereupon the plaintiff moved that she have leave to amend her bill herein, which said motion is granted, and for that purpose this cause is sent to rules with leave to the defendants, if they desire, to reply to said amended bill of complaint."

No additional evidence was taken except the depositions of Franz Gollner and Charles W. Seabright, which had been taken before the making of said report, were retaken, and the deposition of Augusta Juergens and John P. Smith. The sole object in taking these depositions was to prove more definitely, than had been done, when said commissioner's reports were made, the amount due on these bonds and notes, which Charles W. Seabright and the administrator of Henry Seabright claimed had been assigned to Charles W. Seabright and Henry Seabright by Louis Seabright in his lifetime, and especially to prove the wording of the assignment on the back of the bonds and notes, to which the commissioner's report showed he attached much importance. The wording of the endorsements on all these bonds and notes, which could now be produced, were proven to be identically the same and was the same as that on the bonds and notes, which were before the commissioner, when he made his report. It has been copied heretofore in this statement.

At June rules 1882 the amended bill was filed. There is nothing whatever in this amended bill, which was not in the original bill, excepting this, that the plaintiff says in it, that " he has since discovered that C. W. Seabright received notes of Henry Goetze, amounting to $1,000.00, notes of B. Juergens for $1,200.00, note of Carl Stunz $350.00, notes of Wm. P. Meyer amounting to $8,666.66, which the plaintiff now charges the executor to have received in addition to those in the original bill charged and set forth." These statements made in this amended bill were taken from the an-

swers of the defendants to the original bill, there being no sort of controversy between the parties, that Charles W. Seabright held after Louis Seabright's death these notes specified in this amended bill, the only controversy about this matter being, whether he held them as the individual property of himself and Henry Seabright or as executor of Louis Seabright. No new light was thrown on this question by the amended bill or by the answer thereto filed by Charles W. Seabright or by these depositions taken since the commissioner's last report.

The answer of Charles W. Seabright to this amended bill was but a repetition substantially of his answer to the original bill. None of the other defendants answered the amended bill. The answer was not filed till September 29, 1883, and it was replied to generally.

But nearly a year before this on October 24, 1882, Charles W. Seabright executor of Louis Seabright filed a demurrer to the amended bill of the plaintiff, in which he assigns nine reasons, why the amended bill is not sufficient in law or equity. This demurrer is in the exact words of the demurrer to the original bill, and these nine reasons, why the bill was insufficient, are precisely the same nine reasons, which were set out in the demurrer to the original bill, which had been overruled; and the court overruled the demurrer to the amemded bill.

On December 11, 1883, the court entered the following order:

"This case having been at the last term submitted to the court on the motion of the plaintiff to suppress the depositions of Charles W. Seabright, taken for the defendants in this case, the court having fully considered the same, it is now here ordered that the part of the depositions of the said C. W. Seabright, stating personal communications with the said Louis Seabright in the absence of the plaintiff, be and the same is here suppressed; to which ruling the defendants except."

On October 11, 1884, the court entered this final decree:

"This cause came on this day to be further heard upon the bill and amended bills and exhibits, the answers and amended answers of the defendants filed herein, the deposstions of

Franz Gollner, Dan'l Peck, William P. Meyer, the complainant, Louisa Seabright, George Hooth, Augusta Juergens, John P. Smith, Martin Fisher, Henry Wiedebusch, and others filed in this cause, and the arguments of counsel in writing contained therein, the orders and papers heretofore entered and read herein, the second report of commissioner Hannibal Forbes filed herein on June 30, 1879, and the exceptions of the defendant, Charles W. Seabright, endorsed thereon, and was argued by counsel. Upon consideration thereof, the court is of the opinion that the exceptions to said report are well taken and should be sustained, which is accordingly done and so ordered; and the court being of opinion that there is no necessity for an account to be taken of any matter set up or in the bill contained; the order for an account heretofore entered in this cause is set aside; and the court having heard the arguments of counsel on behalf of the complainant and defendants upon the main case and the matters and things in the bills, answers, exhibits and depositions contained, upon consideration thereof, is of the opinion that there is no cause to surcharge or falsify the accounts of Charles W. Seabright, executor of the last will of Louis Seabright, deceased, nor is the said C. W. Seabright in his individual right indebted or accountable to the complainant in any sum whatever by reason of anything in the bill or amendments contained as shown by the evidence herein.

"The court is further of opinion and so finds, that the notes mentioned and described in the amemded bill of complaint, were not a part of the estate of Louis Seabright, deceased, at the time of his death, but before that time had been delivered to the defendant, C. W. Seabright, by the said Louis Seabright in his lifetime as a gift to the said C. W. Seabright and Henry Seabright. And the complainant not having anything further to urge in support of her bill as amended, and not desiring to further amend the same, and the court not finding any equity in the bill, it is ordered, adjudged and decreed that the complainant's bill and amemded bill be dismissed, and that the defendants recover of and from the complainant their costs in and about this suit expended in their behalf. And the complainant desiring to make application to the Supreme Court of Appeals for an appeal in this cause, exe-

cution is stayed for sixty days from this date upon the plaintiff giving bond in the penalty of $250.00, conditioned according to law, with surety to be approved as sufficient by the clerk of this court."

From this decree the plaintiff Louisa Seabright obtained an appeal.

Opinion by GREEN, JUDGE:

The principal object of the plaintiff, Louisa Seabright, in the institution of this suit was to surcharge the *ex parte* settlements of Charles W. Seabright the executor of her deceased husband, Louis Seabright, which had been made before James O. Morris, a commissioner of the county court of Marshall, and one of which had been confirmed by said court. She sought to charge said executor with certain bonds and notes, which, she claimed, belonged to the estate of her deceased husband, which said commissioner had failed to credit the estate with in these *ex parte* settlements. The principal of these bonds amounted exclusive of all interest to upwards of $22,000.00. In the settlement made during the progress of this suit by Commissioner Forbes he charged the executor with these bonds and notes. This action of the commissioner was excepted to, and by the final decree in this cause the court sustained the exception in effect and decided, that said bonds and notes were not a part of the estate of Louis Seabright at the time of his death, but that before that time they had been delivered to the defendant, Charles W. Seabright, in the lifetime of Louis as a gift to the said Charles W. Seabright and Henry Seabright. Therefore the court dismissed the plaintiff's bill at her costs.

Before considering the merits of this cause we must first decide, whether it is so presented by the record as to justify us in expressing any opinion on its merits, or whether the errors committed prior to the rendition of this final decree were such, as require this Court to reverse the decree and remand the cause without any expression of opinion on the merits of the cause. Before reviewing these proceedings with this view I propose to consider, what proceedings are necessary to surcharge and falsify an *ex parte* settlement of an executor's accounts made before the commissioner of the

county court, before whom the executor qualified, after such *ex parte* settlement has been approved by such county court, and the report and *ex parte* settlement have been recorded in the clerk's office of such county.   There was no statute in Virginia prior to the Code of 1849 declaring the effect and weight of such *ex parte* settlement of an executor, though from a very early day there were statutes in Virginia, which declared, that such *ex parte* settlement of a *guardian* and also inventories and appraisements returned by executors should be regarded as *prima facie* correct but subject to be surcharged and falsifed.   For these acts see R. C. of 1819, ch. 104, sec. 45, vol. 1, p. 387, and ch. 108, sec. 7, p. 407.   A stated account is an account, which has been examined by the parties and the balance admitted as the true balance without having been paid.   Such stated accounts have always been held to be *prima facie* correct but liable to be surcharged and falsified.  (*Vernon* v. *Vawdry*, 2 Ark. 119; *Chapedelaine* v. *Dechenaux*, 4 Cran. 203).   But if there be a fraud in the settlement of an account, such *stated* account can not be relied upon by the party committing the fraud as *prima facie* correct, but the whole account will be opened.  (*Mathew* v. *Wallwyn*, 4 Ves. 118; *Botifner* v. *Weyman*, 1 McCord Ch'y 161).   Such an *ex parte* settlement before a commissioner of a county court approved by the court and recorded has always been held in Virginia as *prima facie* correct but subject to be surcharged and falsified, as a *stated* account between parties could be; and the proceedings, by which it was to be surcharged and falsified, were always the same as the proceedings for a like purpose, where the account was a *stated* account   (*Anderson & Starke* v. *Fox et als.*, 2 H. & M. 260).

Nevertheless a *stated* account and such *ex parte* settlement of an executor did not in all respects stand upon the same footing.   Thus a fraud in making a settlement by one of the parties to it would, as we have seen, vitiate the whole account, and it could not be relied upon as *prima facie* correct as to any items in it, but the whole account would be opened. On the other hand, though it were proven, that an executor had taken an unfair advantage, he could still rely upon such an *ex parte* settlement as *prima facie* correct in all items, which were not falsified by proof.   This was because this

*prima facie* weight given in such *ex parte* settlement was based not on the acquiescence of the other . parties in the correctness of the balance due on the account as stated, as was the case in a *stated* account, but on the supposed integrity of the county court and its commissioner, upon whom the law imposed the duty of settling such *ex parte* accounts of executors, and upon the long established practice in Virginia influenced perhaps by the statutes in reference to the weight to be given inventories and appraisements returned by executors and *ex parte* settlements made by guardians, to which I have referred before.  (See *Newton and wife* v. *Poole*, 12 Leigh 112).  In the Code of Virginia of 1849 it was expressly provided, that such *ex parte* settlement of an executor to the extent, to which it was confirmed, should be taken as correct, except so far as it may by a suit in proper time be surcharged and falsified; and this has remained the statute-law both in Virginia and in this State ever since.  (See Code of Va. of 1860, ch. 132, § 23, p. 605 ; Code of W. Va. of 1868, ch. 87, § 22, p. 513, Warth's Amended Code of W. Va. ch. 87, § 22, p. 605).  The mode of surcharging and falsifying *ex parte* settlements of executors is not prescribed by statute, and it is, as it always has been, the same as the mode of surcharging and falsifying *stated* accounts.  (See *Anderson & Starke* v. *Fox and others*, 2 B. & M. 260 ; *Shugart, adm'r*, v. *Thompson's adm'r*, 10 Leigh 434 ; *Corbin et al.* v. *Mille*, 19 Gratt. 465, and *Chapman's adm'rs* v. *Shepherd's adm'r et als.* 24 Gratt. 389, 390).  From the last of these cases I will quote, what is said by Judge Staples with reference to the mode of proceeding :

"The sixth and last exception is to the action of the commissioner in re-opening the *ex parte* settlements in the county court without any particular surcharge and falsification averred in the bill.  The rule that administrative accounts settled *ex parte*, returned and recorded in the proper court, are to be taken as *prima facie* correct, liable only to be surcharged and falsified by proper averments, has received the sanction of this court in numerous cases.  The inconvenience of the rule has been often felt, and in some few instances 'exceptions and modifications have been allowed when necessary to attain the justice of the case.

"The case of *Shugart, adm'r* v. *Thompson*, 10 Leigh 443, is a familiar illustration. There the answer denied all the allegations of the bill intended to impeach the *ex parte* settlements; it was therefore not proper to send the cause to a commissioner to re-settle the account in the absence of evidence to sustain these allegations. (See *Wyllie and wife* v. *Venable's ex'or*, 4 Munf. 369; *Peale* v. *Hickle et als.* 9 Gratt. 445). Nevertheless an order of account was made and the parties proceeded with their proof before the commissioner.

" The facts then established did not sustain the specific objections urged in the bill to the settled accounts, but they showed other grounds for surcharging the settlement. Judge Stanard says the court might have required the plaintiff to amend his bill by inserting the other matters of surcharge and falsification, so as to afford the defendants the benefit of an explanation and defence by way of answer; or dispensing with that circuitous and formal proceeding the court might have permitted the commissioner to proceed with the investigation in like manner as if the matters had been noticed in the bill. If the defendant should object he was taken by surprise, the court should give him time to combat the new charges. If he urged the privilege of defending himself by answer, that privilege might be secured him by allowing him to file his affidavit, and giving it the effect of an answer.

"In the case before us the *ex parte* settlements made by the commissioner of the county court were erroneous upon their face, in bringing charges against the legatees into the executorial accounts, and in allowing the executors commissions on their receipts. It is also to be observed that these settlements did not profess to be final or to embrace all the transactions of the executors. The court therefore very properly referred the accounts to one of its commissioners to settle and adjust. In the progress of the investigation it was discovered that the executors had omitted to charge themselves with various debts lost by their negligence, and with debts due by one of them to the testator. With the exception of those omitted items, the commissioner obtained the principal material for his account from the *ex parte* settlement. The only important change in the settlements consisted in the addition

of the omitted debts and in separating the administrator's accounts proper from those of the legatees. The defendants did not complain of any surprise. They did not insist upon any specifications in writing. They did not claim the benefit of any explanation by way of affidavit or answer. The fullest and most thorough investigation was had; and it is very clear that no injustice has been done in reforming the *ex parte* settlements, and in making the additional charges. Under these circumstances it will be productive only of expense and trouble to send the cause back for the plaintiff to go through the useless formality of amending his bill by inserting matters already investigated before a commissioner, and with respect to which the defendants have not proposed to make any defence or explanation other than is already made. For this reason I think the court did not err in overruling the sixth exception."

It seems to me that the judge, who pronounced this opinion, correctly understood the decision of the court and the opinion of Judge Stanard, who pronounced it, in the case of *Shugart's administratrix* v. *Thompson's administrator*, 10 Leigh 443. That case was a bill to surcharge and falsify a *stated* account. But the principles, which control the mode of proceeding to surcharge and falsify a *stated* account, except where there has been fraud in making the settlement, are properly assumed in *Chapman's administrators* v. *Shepherd's administrator et als*, 124 Gratt. 589, to be the same as those in a cause brought to surcharge and falsify an *ex parte* settlement of a personal representative, which had been returned and recorded in the proper court. Judge Joynes in the case of *Corbin et als* v. *Mill's executor et als* and other cases in 19 Gratt. 465 seems to put a somewhat different construction on the decision of the court in *Shugarts' administratrix* v. *Thompson's administrator*, 10 Leigh 434. Judge Joynes says in *Corbin* v. *Mill's executor et als*, 19 Gratt. 465:

"The executors might have objected to an overhauling of the transactions embraced in their settled accounts, except so far as they might have been open to objections apparent on their face on the ground that there was no specification of errors in the bill. It is a familiar principle, that the accounts of an executor, which have been regularly settled in

the mode provided by law, are to be taken as *prima facie* correct. They are liable to be impeached on specific grounds of surcharge or falsification to be alleged in the bill, but the court will not decree an account upon general allegation that settled accounts are erroneous. The rule not only results from the presumption which the law makes in favor of the correctness of a settled account, but it is necessary to prevent surprise to the defendants, and give them the advantage of their answer, to which they are entitled, on the principles which govern equity practice. When an account has been ordered on a proper bill, additional objections to settled accounts may be discovered in the progress of the case. It would be attended with inconvenience and delay to require the plaintiff in any such case to amend his bill for the purpose of alleging the additional objections. It will save time and expense, and generally be attended with no inconvenience to allow the plaintiff to raise the objection before the commissioner with a proper specification in writing, and to allow the defendant to meet the objection by an affidavit, giving to the affidavit the same right which could have been given to an answer if the matter had been alleged in the bill. This is the full extent to which the settled rule of practice can be safely and conviently relaxed, and this is the extent to which I understand it, Judge Stanard meant to go in *Shugart's administrator* v. *Thompson's administratrix*, 10 Leigh 434."

As I understand that case and Judge Stanard's opinion, and as it was evidently understood by the court and by Judge Staples in the case of *Chapman's adm'x* v. *Shepherd's adm'r et als.*, 24 Gratt. 389–390, the court and Judge Stanard went further, than Judge Joynes supposes in relaxing the settled rule of practice referred to by Judge Joynes. I understand the Virginia cases to hold, that, while the rule is, that a bill to surcharge and falsify an *ex parte* account of a personal representative duly made and recorded ought to set forth the items of the account, which it is desired to surcharge and falsify ; yet if the error be apparent on the face of the *ex parte* settlement or report, which is sought to be surcharged and falsified, there is no necessity to specially point out such error in the bill, if the *ex parte* account and report is filed

with the bill, and there be only a general charge, that it is erroneous, and the plaintiff in his bill asks generally, that he may be permitted to surcharge and falsify such *ex parte* account, he will be allowed to do so to the extent, that there were errors on its face, though in his bill he has not pointed out any. His counsel may for the first time in the argument of the cause call attention to such errors on the face of an *ex parte* settlement or report, and the court should correct them, though these errors had not been pointed out or specified in the bill. (*Garrett, &c.* v. *Carr et ux et al,* 3 Leigh 413). If in the bill the plaintiff has specified errors but introduces no evidence to sustain the specified errors, or the evidence, which is introduced for that purpose, fails to establish such errors, the court ought to dismiss the bill, unless something improper in the *ex parte* account is disclosed in the answer or is apparent on the face of the account; in which case the court should correct such apparent error or admitted error or refer the cause to a commissioner that it may be corrected. (*Wyllie* v. *Venable's ex'or,* 4 Munf. 369).

The question in such cases arises, whether, if a reference is proper, the order of reference should be general giving the complainant the right to surcharge and falsify before the commissioner such *ex parte* settlements with instructions, that the commissioner should regard such *ex parte* settlements as *prima facie* correct, or whether the order of reference should be restricted to the correction of any errors apparent on the face of the *ex parte* settlement, and to the bringing into the accounts the matters, which by the admissions in the answer ought to have been embraced in it, but which are not, or to correcting the account, where errors in it in favor of the personal representative appear from the facts stated in the answer, though not referred to in the bill. Judge Lee in *Peale* v. *Hickle et als.,* 9 Gratt. 447, expresses the opinion, that in such a case the order of reference should be such restricted order of reference rather than the general order.

It seems to me, that in such case and indeed in every case the order of reference should be general and never restricted. For if restricted, and after the report of the commissioner had been made, the plaintiff asked to amend his bill, because he had discovered, while the cause was before the commis-

sioner, other errors in the *ex parte* settlements, which could not be proven or reported upon, because of the order of reference being so restricted and not a general order of reference, the court would have to permit him to amend his bill, bring into the case the investigation of these subsequently discovered alleged errors, and another order of reference would have to be made. All this inconvenience and delay would be saved by making the first order of reference general. And I can see no objection to so doing; for, if no new supposed errors in the *ex parte* accounts are discovered by either party, while the cause is before the commissioner, the general order of reference would in such case operate precisely as the restricted order of reference. If however the court made a restricted order of reference, where it might better have made such a general order, or if it made such a general order, where no order of reference should have been made, such errors alone, if the final decree of the court was right, would be of course no ground for reversing the decree in an appellate court. Such errors tend to delay perhaps but do not necessarily cause the substantial rights of the parties to be violated.

In the case of *McGuire et al* v. *Wright et al*, 18 W. Va. 507, this Court decided as follows: "When a bill is filed surcharging and falsifying an administrator's account, and the cause is referred to a commissioner for the purpose of having the account corrected, and before the commissioner it is discovered, that the administrator has failed to charge himself with an item properly chargeable against him, and the bill does not notice such item, but there is a thorough investigation before the commissioner of the facts, whether such item is properly chargeable against the administrator, and the administrator takes evidence tending to show, that he is not chargeable with the item, and does not complain of surprise, nor insist upon any specification in writing nor claim the benefit of an explanation by affidavit or answer, an exception to the report charging him with such item is properly overruled."

In that case the exception to the commissioner's report was on the ground that this was an item by way of surcharge of the *ex parte* settlement, and the bill did not surcharge the

said accounts in this particular, and there was no specification of this error in writing before the commissioner nor any reference to it in the pleading. And the court below overrule the exception. There can in this State be no explanation by affidavit by the personal representative either before the commissioner or the court of any item of surcharge or falsification whether specified in writing or not, because such affidavit is but a substitute for an answer; for under our statute (ch. 125 § 59 of Code of W. Va., p. 608, Warth's Amended Code of West Virginia, ch. 125 § 59, p. 709) an answer in chancery is not entitled to peculiar weight as evidence, as it was by the general rules of equity prior to the passage of this statute and still is in Virginia; but such an answer has only the effect of a plea in a common law suit; and if it denies material allegations in the bill, it only throws the burden of proving the truth of such allegations on the plaintiff, whether the answer be sworn to or not. But with certain exceptions, which we will hereafter consider, the personal representative under another West Virginia statute could depose in reference to any item of the *ex parte* account. (See Code of W. Va. ch. 130, §§ 22–23 p. 619, Warth's Amended Code of West Virginia ch. 130 §§ 22–23 p. 724). This Court in *Campbell's administrator* v. *White, trustee, and others* and *Janney et al* v. *Campbell's administrator*, 14 W. Va. 123–143, acted upon the law as laid down in the Virginia cases in reference to the surcharging and falsifying the *ex parte* settlements of an administrator as the law of this State.

These decisions tend to the following deductions as to the proper mode of proceeding in this State, where the accounts of a personal representative settled *ex parte* returned and recorded in the proper court are to be surcharged and falsified:

First.—The bill must set forth one or more items, whereby the plaintiff seeks to surcharge or falsify such *ex parte* settlement, unless there are errors or mistakes on the face of the *ex parte* report and settlement, when there need be no specifications in the bill of such apparent errors, as, when the *ex parte* settlement, which is a part of the bill, is examined, it will disclose the particulars of surcharge or falsification of this sort. A bill defective in this respect, if it be not amended, should be dismissed. It should be dismissed on

demurrer; but if it be not demurred to, and the court should make a general order of reference directing a settlement of the account of the personal representative and instruct the commissioner to regard the *ex parte* settlement as *prima facie* correct subject to be surcharged and falsified by either party, and this be legally and successfully done by the plaintiff, while the cause is before the commissioner, the cause can not afterwards be dismissed for such defects in the bill.

Second.—When an order of reference is made in any suit to surcharge and falsify the *ex parte* settlement of a personal representative, it should be a general order of reference, such as is above named, not a restricted order of reference confined to those items, which have been specified in the bill as the subjects of surcharge or falsification. If the plaintiff does not wish to be confined to those items of surcharge or falsification named in his bill and the errors on the face of the *ex parte* settlement, the proper mode of proceeding is to file with the commissioner a written specification of any additional items of surcharge or falsification, on which he proposes to rely, so as to give the personal representative an opportunity to know, in what respect the *ex parte* settlement is to be surcharged and falsified and thus to prevent him from being taken by surprise. Such written specification is regarded as a substitute for an amended bill. It need not be replied to by the personal representative; but, unless the allegations in it are admitted by the personal representative, they should be regarded as denied. In like manner, if the personal representative wishes to surcharge and falsify such *ex parté* settlement, he should file with the commissioner a written specification of the particulars, in which he proposes to surcharge and falsify such *ex parte* settlement; and it should be regarded, as the written specifications of error by the plaintiff are regarded.

Third.—If either the plaintiff or defendant fails to file such written specifications of error and the parties proceed to take evidence with reference to such additional errors, as if such written specifications of error had been filed; or if in the cause they have taken such evidence without objection, and it is apparent, that neither party has in point of fact been taken by surprise, and the commissioner in his report cor-

rects such errors not named in the bill or in any written specifications filed with him, if his report is not excepted to, because he has acted on such items without written specifications being filed with him, the court should act upon such report, as if such written specifications had been filed, the parties by such conduct being regarded as having waived their right to have such written specifications filed.. But in such case either party may prove to the court, that he has been in point of fact taken by surprise by the non-filing of such written specifications, and, if he do so, the court should refer the cause back to the commissioner to inquire into such items of alleged error, but not otherwise.

Fourth.—If exceptions be filed in proper time to the commissioner's report, because he has introduced into it items of surcharge and falsification not named in the pleadings nor in any written specification filed before him, the court may, if it think proper, for this reason only and without an examination of the evidence, on which the report is based, refer the cause back to the commissioner; or it may inquire, if it think proper, into the question, whether the exceptor has in point of fact been surprised, and in so doing may examine the evidence, on which the report is based, and if satisfied, that the exceptor has not been in point of fact taken by surprise, but that there has been a full and fair investigation of the questions involved in these items so introduced into or so omitted from the report, it may overrule such exception, so far as it is based on the non-filing of such written specifications, and act upon the report, as if the same had been filed before the commissioner.

Fifth.—Where there are no errors on the face of the *ex parte* settlement, and the bill sets forth one or more items, whereby it is desired to surcharge or falsify the *ex parte* account, and the answer denies the allegations of error and discloses nothing improper in such account, and the plaintiff fails to produce evidence sufficiently strong to rebut the *prima facie* evidence of the correctness of the account in these respects, which the law attaches to the *ex parte* settlement, or produces no evidence to sustain the allegations of error alleged in the bill, the court ought not to refer the cause to a commissioner but should dismiss the bill, otherwise it should

refer the cause; but if it should erroneously make an order referring the cause to a commissioner generally to settle the accounts of the personal representative instructing the commissioner to regard as *prima facie* correct subject to be surcharged and falsified by either party any *ex parte* settlements, which had been approved by the county court, the Appellate Court would not reverse the decree, which was right on the substantial merits of the cause, made after the return of the commissioner's report, merely because the court ought not to have made such order of reference.

I propose now to examine the record in this cause and determine, whether according to these views the proceedings have been so irregular as to require us to either affirm or reverse the final decree without reference to the merits of the controversy. Two of the defendants, C. W. Seabright and Louisa Nolte, demurred to the original bill and the court overruled their demurrer. Did the court err in so doing? One of the objects of the bill was to surcharge and falsify an *ex parte* settlement made by Charles W. Seabright as executor of Louis Seabright before Morris, a commissioner of Marshal county court, in which court the will of Louis Seabright had been proven, and before which the executor had qualified. This *ex parte* settlement had been returned to said county court, and by it had been approved and ordered to be recorded. A certified copy of the *ex parte* settlement was filed with the bill and also a copy of the will. Two other like *ex parte* settlements, the bill alleges, had been made and returned to the clerk's office of said county court but had not been approved, and a copy of one of them is filed with the bill. The bill alleges, that the defendant, Charles W. Seabright, executor of Louis Seabright, in all these *ex parte* settlements had failed to account for numerous bonds and notes of Louis Seabright, which represented the purchase-money of lands, which Louis Seabright in his lifetime had sold to various parties, and which bonds and notes were secured by deeds of trust of record in the clerk's office of Marshall county, and that these, which came into his hands and were in his hands after the death of Louis, and which he should have accounted for as executor, exceeded $23,000.00; and that instead of accounting for them he had distributed them or their proceeds among

the legatees or devisees of Louis Seabright excluding entirely the plaintiff, the widow of Louis Seabright, who being unprovided for in the will, and Louis Seabright dying childless, was entitled to one third of his personal estate after the payment of his debts. The names of the persons, by whom these notes unaccounted for were given, are stated in the bill, and the deeds of trust are referred to as giving a full and detailed description of them. There is filed in the bill an abstract of these deeds of trust giving a full description of most of the notes, how secured and the number of the deed-book and page, on which the deeds of trust were recorded. It is stated in the bill also, that Louis Seabright had placed all these notes in the hands of Charles W. Seabright as his agent and attorney in fact on or before January 16, 1873, and had advertised in a paper, that he was his general agent authorized to collect all the debts due him and pay all the debts he owed. A copy of this advertisement is filed with the bill. This was, as the bill shows, only one month before the death of Louis Seabright. The will filed with bill shows, that Louis Seabright had left two specific legacies of $500.00 each to two persons severally and all the residue of the estate was divided and bequeathed to his brothers and sister, Charles W. Seabright, Henry Seabright and Louisa Nolte. Charles W. Seabright was appointed his executor, but no authority was given him to sell any of the real estate. In one of the *ex parte* settlements filed with the bill under date of December 31, 1873, the executor is credited with cash paid Louisa Seabright as dower-interest in the Myers place $729.98 and dower-interest in the home-place $2,683.52 and it is obvious on the face of the accounts, that the executor is charged with many thousand dollars received from the sale of lands. These charges and credits are explained in the report of commissioner Morris, which had been confirmed by the county court, and a copy of which was filed in bill. Commissioner Morris in it says :

"The executor represents to your commissioner that the personal estate of his testator was not sufficient to pay the debts. And the devisees in the will agreed and sold the real estate of said testator, and also agreed the sum in gross to the widow in lieu of her dower therein, the proceeds of

such sale to be paid to the executor, and he to apply the same to the payment of said sum in gross to the widow in lieu of dower and then to the debts against said estate and to the legacies from this estate.   The executor is charged with the purchase-money of the real estate he here received and audited with the payment of the sum in gross to the widow, a large portion of the purchase-money of said real estate is in arrears and unpaid.   Your commissioner has made an allowance of five per cent. commission to the executor on all his receipts on both personal and real estate as appears on the face of the annexed settlement."

This was an obvious mistake on the face of these accounts extending to many items of large amount.   The report of commissioner Morris shows clearly, that Charles W. Seabright received these proceeds of land-sales not as executor but as agent of the devisees and, I suppose, probably of the widow, and he is of course individually accountable to them for the moneys so received and disbursed under this agreement, the provisions of which nowhere appear.   The bill was clearly not filed to hold Charles W. Seabright to any account as such agent; and there is probably no controversy about this, none certainly, which could be settled in this cause, even if the parties desired to do so, as the bill, if it sought such a settlement, would thereby become multifarious.   But it does not seek it.   And Commissioner Morris obviously erred in mixing up this account of Charles W. Seabright individually with Charles W. Seabright's executorial accounts, which were all that the commissioner had any authority to settle. All the items in the *ex parte* settlements of this private account are not *prima facie* correct and are obviously improperly entered in this executorial account.   According to the first rule set out above it is obvious, that this error, when apparent on the face of the *ex parte* settlement sought to be surcharged and falsified, even though not specifically pointed out in the bill, even if it had failed to specify any error, for which the *ex parte* settlement should be surcharged or falsified, would have sufficed to render the bill good.   But, as we have seen, the bill did particularize by an exhibit filed with it many items of surcharge.   The bill is therefore good unless fatally defective because of its viola-

tion of the general rules governing equity pleading. These the defendants, who demurred, have attempted to show.

For grounds of error they say first, that there was a misjoinder of defendants. The executor and residuary legatees or some of the specific legatees were made defendants. As one of the *ex parte* settlements on its face showed, that this specific legatee had been paid in full, perhaps he might have been dispensed with as a party; but as the other defendants were all obviously necessary and proper parties defendant they could not demur, as two of them did, because a specific legatee was unnecessarily made a defendant, even though he might possibly have done so. (See Story Eq. Plead., sec. 445). The suit was afterwards dismisssed as to this specific legatee.

The next reason assigned why the bill should have been held bad on demurrer is, that while the administratrix of Henry Seabright, a residuary legatee, was made defendant, his heirs were not. If I have properly understood this bill, it is obvious, that the heirs of Henry Seabright ought not to have been made parties defendant, as they were heirs, who have no interest in the settlement of the accounts of the executor as a personal representative having no authority under the will of any sort in reference to the real estate of the testator.

The third reason given as a ground of demurrer is, that the plaintiff seeks relief as a widow, and the summons served on the defendants did not require them to answer her bill filed in that capacity. This ground of demurrer scarcely deserves a passing notice. If there had been any error in the summons, which it does not appear that in fact there was, it would on demurrer to the bill of course be disregarded, as it would on a demurrer have been entirely immaterial, whether the defendants had or had not been served with any summons.

The fourth ground of demurrer is, that the bill is multifarious, because it seeks, first, to surcharge and falsify the executorial accounts of Charles W. Seabright, executor of Louis Seabright; secondly, to impeach as fraudulent certain sales of land made by Louis Seabright in his lifetime, and thirdly, to compel the residuary devisees of Louis Seabright

to refund to the complainant certain moneys, which the executor of Louis Seabright has as such, improperly paid to them. As I understand the bill, it has for its object the first and second of the above objects, as is shown by the prayer of the bill; and I can see no objection to the uniting of these two objects in one bill.    It may be questionable on the facts stated, whether or not these residuary legatees, if the facts stated in the bill were true, would be compelled to refund the moneys they had received improperly from the executor (*Anderson v. Piercey*, 20 W.Va. 282), but be this as it may, if the plaintiff was not entitled to this relief, she was entitled to hold the executor of Louis Seabright responsible, if the facts stated in her bill were true, and these residuary legatees were necessary parties to such a bill surcharging and falsifying the executorial accounts.    The fact, that the plaintiff claimed other relief, to which she was not entitled, if such was the case, certainly would not vitiate the bill.    If one of the objects of the bill as alleged in this demurrer was to have certain deeds made by Louis Seabright in his lifetime set aside as fraudulent, if such object could have been sought, of course the heirs of Henry Seabright, deceased, who would own, in case such deeds were set aside, a third of these lands, would have been necessary parties.    But it is obvious, though the bill does idly mention, that these deeds were fraudulent, yet it does not seek to set them aside, but on the contrary is filed for the purpose of empowering the defendants to pay to the plaintiff her share of the notes representing the purchase-money arising from these sales.    Though the bill is rendered to some extent obscure by these sales being spoken of as fraudulent, yet as on the face of the bill it would make no difference, whether they were fraudulent or not, so far as any of the parties to this suit were concerned, and it was therefore not sought by the bill to have them set aside, and the purchasers were not made parties, it is clear, that the bill was not rendered multifarious by these idle allegations, which it contained.

The fifth ground of demurrer is, that an exhibit filed in the bill shows, that the plaintiff's counsel filed at one time some sort of exceptions, what sort does not appear, to the *ex parte* settlement of Commissioner Morris now assailed; and before

said *ex parte* settlement was confirmed by the county court of Marshall, the plaintiff withdrew these exceptions and filed none others.   This, it is claimed, was a waiver of all right to surcharge and falsify this account, unless the bill alleged, which it did not, that the plaintiff had discovered the grounds of surcharge and falsification since said *ex parte* settlement was confirmed by the Marshall county court.   There is nothing in this position; for if it had been shown, that Louisa Seabright had excepted to this *ex parte* settlement before the county court for the very reasons, for which she now seeks to surcharge and falsify it, and she had then withdrawn these exceptions, before the county court of Marshall confirmed this *ex parte* settlement, it would not in any way affect her right afterwards by bill in chancery to surcharge and falsify these accounts, as she has done in this suit.   The action of the county court in confirming this *ex parte* settlement is *prima facie* correct, and nothing, which passed before them, when they confirmed this *ex parte* settlement, could render it more than *prima facie* correct.   This exception is based on a false idea of the province of the county court in making *ex parte* settlements with fiduciaries.   No one can lose anything by failing to make a contest before them, except that as in all other cases their action will be regarded as *prima facie* correct subject to be surcharged and falsified.

The sixth ground for demurrer is also based apparently upon a misunderstanding of our statute-law.   The bill expressly declared, it wanted no discovery of the defendants. This useless declaration, I presume, was made under the false notion, that, though the bill was not sworn to, the defendants could answer the bill on oath, and thus get the advantage of making their answer evidence entitled to particular weight, such as answers formerly had.   This the plaintiff seemed to think he could avoid by disclaiming all discovery from any of the defendants.   And this useless clause in the bill is in the sixth cause of demurrer supposed to make the bill liable to be dismissed on demurrer.   It could not possibly have such effect. · It was simply surplusage and useless.   For under our statute the answers though sworn to are entitled to no more weight than if not sworn to.   In either case they have their legitimate weight as pleadings but

no weight as evidence (See Code of W. Va. ch. 125 § 38, and § 59 p. 604 and 608).

The seventh, eighth, ninth and last grounds of demurrer are that there is no equity in the bill; the bill does not aver, that the executorial accounts are fully settled, and seeks to open the whole executorial accounts in addition to the matters sought to be surcharged. There is nothing in these grounds of objection to the bill. Of course a party is not bound to delay bringing a bill, till the executor chooses to make a final *ex parte* settlement before a county court. If this were so, an executor could escape all responsibility by never making such *ex parte* settlement. The fact, that he has not made a final *ex parte* settlement of his executorial accounts, is on the contrary rather a reason for upholding a bill to surcharge and falsify his accounts, though, it does seem to me, it would not alone be a sufficient reason for sustaining a bill to surcharge and falsify an *ex parte* settlement (see 24 Gratt. foot of page 390). When the cause is referred to a commissioner, the plaintiff has, as we have seen, a right to ask the court to allow him to further surcharge and falsify the accounts before the commissioner.

The court therefore did not err in overruling the demurrer in this cause and on overruling it by its order very properly gave the defendants time to file answers to the bill. Answers were accordingly filed by all the defendants.

The answer of Charles W. Seabright, executor of Louis Seabright, admits, that in the latter part of 1872 Louis Seabright being in feeble health appointed him his agent to collect all his debts and pay his indebtedness, and on January 10, 1873, he gave the public notice of this by an advertisement in a Wheeling newspaper. He admits that he had a portion of the notes claimed in the bill to have belonged to Louis Seabright's estate in his possession as such agent but alleges, that he returned them to Louis Seabright before his death, and before he made his will on February 13, 1873, and then "on the 13th of February, 1873, the said Louis Seabright being in feeble health and about to make his will, and before the same was made, endorsed, delivered, transferred and assigned all the right, title and interest of said Louis Seabright to Henry Seabright and the defendant C. W.

Seabright, in writing, and signed his name thereto on the back of the said notes hereinafter mentioned. Then follows in this answer a list of these notes amounting without interest to $19,116.61. All these notes are designated specifically or generally in the exhibit filed with the bill except "notes of Henry Goetze amounting to $1,200.00 and notes of B. Juergens amounting to $1,200.00." This answer states, that the death of Louis Seabright occurred on February 21, 1873, eight days after the assignment of these notes and the making of his will. The answer claims, that as executor C. W. Seabright has accounted for all the assets, which came into his hands as such executor, and the assigned notes he has divided or their proceeds between Henry Seabright's heirs and C. W. Seabright individually, to whom they belonged.

The answers of the other defendants were substantially the same; and all of them were sworn to.

Upon the filing of these answers and on general replication thereto the court on November 17, 1877, made an order referring the cause to a commissioner, before any depositions were taken. According to the principles laid down in the fifth rule above stated as properly governing in such cases the court properly made an order of reference at this time, both because there were large errors already pointed out on the face of the *ex parte* settlements, which were being surcharged and falsified, and because the answer itself, if unsustained by evidence, discloses that, which would render these *ex parte* settlements liable to be surcharged and the executor of Louis Seabright liable to be charged with the large amount of notes, which he in his answer admits belonged to Louis Seabright his testator some eight days before his death when, he claims, they were given by the testator to himself individually and to his brother Henry Seabright. The burden of establishing this claim of the gift by the testator of these notes shortly before his death was upon the donees. (See *Conklin* v. *Conklin*, 20 Hun. 278; *Walter* v. *Hodge*, 2 Swins. 97; *Coutant* v. *Schuyler*, 1 Paige 316; *Grey* v. *Grey*, 47 N. Y. 552–556).

But as stated in the fifth rule *supra* this order of reference should have been a general order to settle the accounts of Charles W. Seabright as executor of Louis Seabright, in-

structing the commissioner to regard as *prima facie* correct subject to be surcharged and falsified by either party any *ex parte* settlement, which had been approved by the county court of Marshall and ordered to be recorded. The order of reference, which was made is so worded, as to render it questionable, whether it really amounted to such general order of reference, or whether it was only a special order directing the commissioner to report, whether the specific surcharges of the *ex parte* settlements named in the bill were sustained in whole or in part. The language of the order of reference was to a commissioner "to examine the accounts heretofore filed of the said estate and ascertain, if the said executor, C. W. Seabright, is liable to be charged with said several sums of money or the notes and deeds of trust in the exhibit B. mentioned or any or either of the said sums of money or notes or deeds of trust and report, if he shall so find the said C. W. Seabright liable, for how much he is liable to account, and how much his said accounts by reason thereof should be surcharged. Before the taking of the said account the said commissioner shall give twenty days notice, &c."

It seems to me, that this order may be reasonably interpreted to direct the taking by the commissioner of the executorial accounts of Charles W. Seabright, executor of Louis Seabright, and as further directing a particular inquiry and report in regard to the specific surcharges made in the bill. Unless this order be so interpreted, it is difficult to understand, why it speaks of taking an account, for no account would be taken, if this order is interpreted as the commissioner seems to have interpreted it, that the executorial accounts of Charles W. Seabright were not to be examined or any re-statement of them made, though there were, as we have seen, errors to a large amount apparent on the face of them, but his duty was confined to ascertaining, which of the debts named in Exhibit B. filed with the bill, if any of them, should be charged to the executor, when his accounts were settled. But he even reports not only, which of these debts upon the evidence he regarded the executor as chargeable with, but he also reports, that he is chargeable with "the notes of Juergens and Goetze amount-

ing to $2,400.00 and $720.00 interest thereon. These were notes admitted in the answer of the executor to have come into his hands at the same time with the other notes, which are named in said report and referred to in Exhibit B. filed with the bill; and the answers claim, that these notes of Juergens and Goetze did not belong to the testator, Louis Seabright, at the time of his death for the same reasons as those on which it is claimed, that none of the notes named in said Exhibit B. belonged to Louis Seabright at the time of his death. This report in my judgment was based on too narrow a construction of the decree of reference. But it must be admitted, that this order of reference was very badly worded and was liable to misconstruction.

Exceptions were taken to the report one of them being, that the report was not made at the place, where by the notice the commissioner gave it was to be made. The court did not act upon the merits of this report, but on May 12, 1870, in order to avoid some of the exceptions made to it, gave leave to the plaintiff to file several certified copies of papers taken from the office of the clerk of Marshall county such as copies of deeds of trust and of the appraisement of the personal estate of Louis Seabright, deceased, at the same time the cause was recommitted to the commissioner to give ten days personal notice of the time and place of executing the order and with direction: "To state the account between these parties and report the evidence on which he based his findings." This seems to show, that the court below expected its commissioner to state the executorial accounts of Charles W. Seabright as executor of Louis Seabright. In so doing, as has been stated in the second rule, he ought to have permitted either the plaintiff or the executor or any other interested parties to surcharge and falsify the *ex parte* settlement in a proper manner before him and ought to have corrected it where erroneous on its face. The commissioner however under this report, as he did under the first, confined his enquiries to the surcharges made in the bill and added to them only the notes of Juergens and Goetze of $2,400.00 with $720.00 of interest on the same, these being notes of which we have before spoken as admitted in the answer of the executor to stand on the same footing as to his

liability to be charged with them, as the other notes, which the commissioner reported, that he was chargeable with, and which he had declined to charge himself with in his *ex parte* settlement. The report does not differ from the first report, except that the commissioner states, on what evidence he had based his conclusions, being nothing other than the depositions and exhibits, which had been filed long before in the cause. He also gives his reason for his conclusion, that the executor was chargeable with specified notes, the principal of which amounted to $20,116.66, and all of which were the bonds and notes, which the executor and other defendants claimed were assigned by the testator to Henry Seabright and Charles W. Seabright eight days before his death as a gift and actually then delivered by him as such to Charles W. Seabright. Nearly all of these notes so charged in this commissioner's report are specified in these answers as notes thus assigned and delivered by Louis Seabright in his lifetime, and which therefore never came into the hands of Charles W. Seabright as executor according to their claim.

Eight exceptions were filed by Charles W. Seabright to the report of the commissioner; but, before it was acted upon, the court gave leave to the plaintiff to amend her bill; and for this purpose the cause was sent to rules, and the plaintiff there amended her bill, but in her amended bill made no allegation, which in any way qualified or changed the case, as it was then before the court, simply alleging, that in addition to the notes, which were named in Exhibit B., and which she claimed had been received by Charles W. Seabright as executor, and he had refused to account for as such, she had discovered, that he received other notes, for which he ought to be charged as executor, but which he refused to account for. These additional notes are particularly specified. The specification is taken from the answer of the executor, who in it sets up the same claim to them as to the others. All these notes including these additional ones named in the amended bill had been specified in the report of the commissioner, and he had reported that the executor was responsible for them; and the said executor had excepted to said report, because, he claimed, the evidence showed, that none of these notes belonged to Louis Seabright at the time of his death, and the executor

was not therefore accountable for them. It then this report and exceptions fairly put in issue all matters, that could be put in issue under this amended bill, the court ought to have held, that such amended bill was bad, and ought on demurrer to have sustained the demurrer and dismissed the amended bill. But instead of so doing it by an order made July 11, 1883, overruled this demurrer ; and as the amended bill had been filed at rules by leave of the court, there could be properly no decree of any kind rendered upon it, until it had regularly matured by the proper proceedings at rules, which it does not appear to have done; but the court proceeded, as if the amendment had been by its leave filed in open court. Such an amended bill, as was filed, the court ought not to have permitted to be filed in open court, as it brought no new matter whatever, as I shall presently show, into the cause and was entirely futile. Had a different kind of bill been filed at rules, the court having sent the cause to rules, that an amended bill might be filed, and the amended bill had been regularly and properly returned at rules for hearing, and the court had properly overruled a demurrer to it, still this order of July 11, 1883, simply overruling the demurrer would have been erroneous ; it should have granted the defendant demurring leave to file his answer before a specified day, as has been repeatedly decided by this Court. [*Moore* v. *Smith*, 26 W. Va., points 2 and 3 of syll., p. 383, 384; *Park* v. *Petroleum Company*, 25 W. Va., point 6 of syll., p. 112; *Peck* v. *Chambers*, 8 W. Va. 210; *Nichols* v. *Nichols*, 8 W. Va. 174, also *Sutton* v. *Gatewood*, 6 Minn., p. 398; 2 Robinson's (Old) Practice, 302]. This was however cured by this defendant actually filing his answer.

But though there were so many errors in this order of July 11, 1883, overruling the demurrer to said amended bill, in this particular case they constitute no ground for reversing the final decree rendered by the court dismissing the bill. If on its merits this final decree be found correct, the court should have entered it, when it did ; and no injury would have been done to any one, though no time had been given to answer this amended bill, as it had been answered, and though filed at rules, it had never been properly returned for hearing. It was in fact answered by C. W. Seabright

nominally his answer being but a repetition of his answer to the original bill. Certain depositions were also taken in reference to the new allegations in the amended bill taken from the answers to the original bill, but they were really unnecessary. The whole proceedings under this so-called amended bill were unnecessary and useless and entitled to no consideration in the final decree to be entered in the cause; and on the face of this final decree it is obvious that they received none.

However irregular therefor all these proceedings under this so-called amended bill were from their inception, they would not justify a reversal of the final decree or prevent consideration by this Court of the decree, which should be rendered on the merits of the case as presented by the record, if such final decree should be reversed. This amended bill and all the irregular proceedings under it originated doubtless in the false idea, that without such amended bill the court could not act upon the commissioner's report or decide the main question in controversy. For instance, the commissioner had reported, that the notes of Juergens and Goetze, the principal of which amounted to $2,400.00, the executor Charles W. Seabright was responsible for, as they constituted a part of the estate of Louis Seabright, deceased, and had not been effectually given by him in his lifetime to Charles W. Seabright and Henry Seabright as claimed by them in their answers. This was thought doubtless to be a surcharging of the *ex parte* settlement of the executor before the commissioner improperly, because these particular notes had not been named in the original bill, nor had there been any specification of them in writing before the commissioner as subjects of surcharge; but under rules two and three before stated the commissioner did not err fatally in considering the question, whether these notes were or were not chargeable to Charles W. Seabright as executor of Louis Seabright and proceeding, just as if they had been mentioned in the bill or in written specifications filed before him as subjects of surcharge, as no objections to his so doing were made either before him or by exceptions on that account filed to his report or before the court in any manner, and the parties had all evidently regarded this as a matter of controversy in the suit

as well as before the commissioner, and it was most obvious that no person was or could have been surprised by the action of the commissioner, as these notes had been named in the defendants' answers and therein claimed not to belong to the estate of Louis Seabright but to Charles W. Seabright and Henry Seabright by an assignment of them as a gift by Louis Seabright in his lifetime, and the parties had taken depositions on this question of controversy. The matter thus reported upon the court could legitimately act upon, the subject of controversy being submitted to the court fairly by the exceptions to the commissioner's report, and all the evidence, on which this report was based as well as the reasons, which controlled the commissioner, being specially reported to the court by its directions.

It is true there were no less than eight exceptions filed to this report, any of which, if they had been well founded, would have excluded from the court the consideration of this report on its merits; but all the exceptions of this character were unfounded and idle. As for the first of the defendant's exceptions, that a duly certified copy of the appraisement of the estate of Louis Seabright, deceased, and duly certified copies *of* certain deeds of trust, in which the notes the subject of controversy were mentioned, were considered as evidence by the commissioner, these perhaps had been filed as evidence under an order of the court permitting them to be filed and specifying them particularly, and of course they were properly regarded as evidence, though it would have been more regular and suitable to have filed them as exhibits with the bill. Other exceptions were based on the allegation, that no proper notices were served on the defendants. There was in fact no foundation for an exception of this character, the report showing, that there was no just foundation for such exceptions. All the other exceptions of the defendant but one may be regarded as amounting simply to this, that the commissioner erred in reporting each and all of the various notes named in his report as chargeable to Charles W. Seabright as executor of Louis Seabright, but should have reported each and all of them as the individual property of Henry Seabright and Charles W. Seabright. There are a number of different forms, in which, it is claimed, that this error ex-

ists. But these different exceptions might just as well and better have been here put in a single exception to this effect. The single other exception of the defendants (the seventh) is, that if it be admitted, that the executor was properly chargeable with the notes named in the report, their amount is not as much as reported. This I suppose refers to the interest said to be due on these notes. This is the seventh exception.

The plaintiff also filed three exceptions to this report based on the erroneous reasoning assigned by the commissioner for the conclusions reached by him. The substantial conclusions are not excepted to; and I deem it unnecessary to take any further note of these idle exceptions of the plaintiff.

The court in its final decree of October 11, 1884, substantially sustained the exceptions to the commissioner's report filed by the defendants and expressed the opinion and found, that the notes named in the commissioner's report and amended bill were no part of the estate of Louis Seabright, deceased, at the time of his death, but had been before delivered by him to the defendant, Charles W. Seabright, as a gift to him and Henry Seabright; and that there was no ground for surcharging the *ex parte* settlement of Charles W. Seabright as executor of Louis Seabright; and that said Charles W. Seabright was not in his individual capacity indebted or accountable to the plaintiff in any sum by reason of any thing alleged in the bill or amended bill; and therefore the bill was dismissed at the plaintiff's costs, she not desiring further to amend it.

Was there any error in the decree on its merits as disclosed by the record? We have seen, that the court as to the matters contained in this decree despite the gross irregularities, which had been committed, was justified in considering the matters, which it did consider, on their substantial merits. The important question, whether these bonds or notes amounting to more than $20,000.00 of principal, which were endorsed by Louis Seabright generally on February 13th, "For value received, I hereby transfer and assign all my right, title and interest in this note to Henry Seabright and Charles W. Seabright," were in point of fact delivered then to Charles W. Seabright for himself and

58

Henry Seabright as a gift, was decided in the affirmative by the court in this final decree. Did the evidence, all of which was before the court, justify this conclusion? The delivery of these notes so endorsed by Louis Seabright at that time by him to Charles W. Seabright is proven by Charles W. Seabright, who testifies, that, when Louis Seabright handed him these notes, he told him they were his and his brother's. They were according to his testimony a gift from Louis Seabright to him and his brother Henry.

It becomes then important to decide, whether this evidence is admissible, as it is the only direct testimony as to the delivery of these notes by Louis Seabright in his lifetime to any one as a gift. It is of course undisputed that Charles W. Seabright's evidence above stated would by the established rules of evidence in force in common law and chancery suits independent of statute-law have been inadmissible in this cause, both because he was a party to the cause and because he was testifying in his own favor about a matter in which he had a direct interest. But it is claimed, that this evidence of his was admissible under the statute-law of this State in force, when this final decree was rendered December 11, 1883, and still in force in this State. That statute-law is found in Warth's Amended Code of West Virginia, ch. 130, sec. 23, p. 724, as follows:

"No person offered as a witness in any civil action, suit or proceeding shall be excluded by reason of his interest in the event of the action, suit or proceeding, or because he is a party thereto, except as follows: No party to any action, suit or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any personal transaction or communication between such witness and a person at the time of such examination, deceased, insane or lunatic, against the executor, administrator, heirs at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person or the assignee, or committee of such insane person or lunatic. But this prohibition shall not extend to any transaction or communication, as to which any such executor, administrator, heir at law,

assignee, devisee, survivor or committee shall be examined in his own behalf, nor as to which the testimony of such deceased person or lunatic shall be given in evidence."

As by this provision of our statute-law many distinct and separate matters are mingled and united in a single sentence, we will state the substance of this provision, so far as it bears on the question we are discussing separate from all the extraneous matters contained in the same clause. When this is done this section 23rd of chapter 130 as amended will read: "No party or *interested person* shall be examined as a witness in regard to any personal transaction or communication between such witness and a person deceased at the time of such examination against the executor, administrator, heir at law, assignee, *legatee, devisee or survivor* of such deceased person. But this prohibition shall not extend to certain specified cases." This provision in this form was passed March 27, 1882, and went into operation ninety days thereafter (See Acts of 1882 ch. 160 § 23, pp. 538–544). It was an alteration of the law, as it had existed before, as contained in the Code of 1868 in ch. 130 § 23, p. 619, there being added to the corresponding provision in the Code the words which we have italicised above. These additional words it will be observed extend considerably the *incompetency* of witnesses to testify as to the transactions or communications had personally with a decedent. The additional cases, in which a witness was declared incompetent to testify of such matters, being those, which, though not within the words of this provision of our Code of 1868, were apparently within the spirit of the law as contained in the Code so amended. Thus there was added in this act of 1882 as among the persons, against whom a party could not testify, legatees, devisees or survivors of the decedent.

The case, which suggested the adding of the word survivor was probably *Carlton, Chamberlaine & Co.* v. *Mays & Co.*, 8 W. Va. 245, wherein it was decided, that "surviving partners are not assignees in law of their deceased partner, and the 23rd sec. of ch. 130 of the Code does not apply to actions against such survivors, when a party defendant is a witness to prove payment to a deceased partner during his life." There could not be assigned well any reason, why a personal

transaction between the witness and the deceased partner, such as the payment by the witness to the deceased partner personally of a debt due from the witness, should be allowed to be proven by this debtor; but as no words could be found in this twenty-third section, which prohibited such evidence being given by the debtor, this Court held, that it was competent testimony. Such testimony would however under this act of 1882, the present law, be obviously incompetent, as by it such testimony could not be given against a *surcivor* of the decedent.

As there is thus a material difference between this act of 1882 and the Code, it becomes important to determine, whether the competency of this evidence of Charles W. Seabright of the delivery of these notes to him by his testator Louis Seabright in his lifetime as a gift is to be determined by the provisions of this act of 1882 or by those provisions contained in the Code of 1868. This question has in effect been decided by this Court in *Zane* v. *Fink et al.*, 18 W. Va. 695, point 9 of syll., where it was decided, "that within the meaning of this section 23rd of chapter 130 of the Code a party testifies in his own behalf, at the time his deposition in his own behalf is used in a chancery cause, when it is read at the hearing of the cause, not at the time the deposition was actually taken (See 18 W.Va. 752). The deposition of Charles W. Seabright, the competency of which is disputed, so far as he testifies, that Louis Seabright the decedent delivered these notes and bonds to him as a gift on February 13, 1873, was taken November 4, 1878, when the law contained in the Code of 1868 with reference to incompetency was in force. But the final decree in this cause was rendered October 11, 1884. When it was rendered, the court below for the first time considered and decided, "that these notes were not a part of the estate of Louis Seabright deceased, at the time of his death but before that time had been delivered to the defendant C. W. Seabright by the said Louis Seabright as a gift to said Charles W. Seabright and Henry Seabright." As the decision was rendered subsequent to the time, when this act of 1882 went into effect, according to our decision in *Zane* v. *Fink et al.* we must determine the competency of Charles W. Seabright to testify on the point so decided not by consider-

ing the act in force, when his deposition was taken, that is, the provision in the Code of 1868, but by considering the act in force when this testimony was considered by the court below, if considered at all at the time this decision was rendered on October 11, 1884.

The general principles to be deduced from the decisions of this Court are, that this statute, which removes the disability to testify, which by the common law attached to a party to a suit and to any person having a direct interest in the event of a suit with the exception, that such disability as to such persons should continue as at common law, if his testimony was in regard to any personal transaction or communication between such witness and a deceased person, and the testimony of the witness was against certain specified persons, so far as the exception continuing the disability of such witnesses, in certain cases is concerned, should be liberally construed to avoid the evils, which it was apparent must have resulted but for such exception. The spirit of this statute is to permit any person, whether interested or not or whether a party to a suit or not, freely to testify, it being regarded, that it was not necessary to exclude such persons upon the common law idea, that their testimony would be biased and unreliable, provided that the other party to the transaction, out of which the suit arose, was living and by his testimony could give his version of the same transaction; that under these circumstances the court or other tribunal trying the case could be safely trusted despite the biased character of the evidence to deduce the truth from perhaps the conflicting statements of the same transaction by the plaintiff and the defendant. But the statute seems to proceed upon the idea, that this would be safe so long as the plaintiff and defendant were testifying to or about the same transaction, of which each had personal cognizance; but that it would be unsafe to permit either party to testify in regard to a transaction or communication had personally with a decedent, where the controversy was with any person, who after the death of the decedent represented in the suit the interest of the decedent in the subject of controversy. For in such case, as the decedent could not be heard with reference to such transaction or communication had with him personally by such party or interested

person, it would be unsafe and not tend to produce justice to hear the testimony of the living and interested party to such transaction or communication, the temptation to perjury, when generally there would be no means of proving it, being in such a case so great as to render it unsafe to allow such testimony to be given.

Our Court in view of the great dificulty, which exists, to find language, which would under all circumstances effect the object, which the legislature apparently had in view, has construed the language actually used in the statute-law liberally with a view to suppress the evil, which this exception to the removal of these common law disabilities was designed to avoid. Thus the words "personal transaction or communication between such witness and a decedent" have been given a broad interpretation and have been decided to include, where the subject of controversy was an implied *assumpsit* to pay witness for work and labor and services rendered deceased, any and all acts done at any time during the decedant's lifetime, out of which an implied *assumpsit* on his part would have arisen. A party to such a suit brought against the personal representative can not testify, what work and labor he had done for the decedent in his lifetime, or what services he had rendered him in his lifetime, this being construed to be testifying in regard to personal transactions with the decedent. (See *Owens v. Owens, administrator*, 14 W. Va. 88). *Calwell v. Prindle's administrator et al.*, 11 W. Va. 324, &c., may be referred to as another of those cases in which a very liberal construction was given to these words "a personal communication with a deceased person." If a strict instead of a liberal construction had been given the words of the statute, it might be said, that in the first of these cases what was proven ought not to be regarded as a personal transaction between the decedent and the witness, because perhaps the great mass of the work and labor done for the deceased as well as the services rendered him proven by the witness to have been done was done, when he was not present, and therefore it could not properly come within the words of the statute, it could not be regarded as a *personal* transaction. But this phrase being as broad as any phrase, which could have been adopted by the legislature, it ought to be interpreted, as it was interpreted

by this Court, if we would suppress the evil and avoid the injustice, which the legislature evidently intended to suppress and avoid. The legislature could have made known its intentions only by the use of broad and necessarily indefinite phrases, unless it entered into such minute details in the statute, as would have rendered it very lengthy and confused; and even if it had attempted to do this, there can be little doubt, but that it would still in the infinite variety of human transactions have omitted many, which would have been expressly included, had it been practicable or even possible to describe each transaction in detail intended to be included.

· In the same spirit our Court has given to the words "personal communication" used in the statute the same liberal construction. From Judge Haymond's opinion in *Owens* v. *Owens, administrator*, 14 W. Va. 97–8, we may infer, that in his opinion personal communication with the deceased would include a conversation held by the deceased in the presence of the interested party produced as a witness, though the conversation was not with the witness, but he simply testifies to having overheard such conversation and what was said by the deceased. This question has not been decided in this State, but I am of the impression at present, that, whenever it shall be presented, such witness will be decided incompetent to testify to such a conversation with a deceased person. In *Anderson* v. *Cranmer et al.*, 14 W. Va. 562, 576, it was decided, that conversations held with a deceased person at any time, though not on the subject in controversy, but which simply tended to prove facts, which would go to show, that the subject in controversy should be decided against the representatives of the deceased, could not be proven by the witness. In *Martin* v. *Smith*, 25 W. Va. 580, it was decided point 5 of syll., that when "a widow files her bill as administratrix of her deceased husband claiming as her own certain bonds, which she avers were given to her by her intestate husband before and in consideration of marriage, she was incompetent as a witness to prove the gift or delivery of these bonds." In that case her husband died utterly insolvent, so that there was no controversy really but with the creditors of the estate; and it was contended, that under the

provisions of our Code, which we have seen did not mention creditors, she was only incompetent as a witness in such case as against an executor, administrator, heir at law, or next of kin, and therefore might testify against creditors as to personal transactions with the deceased. But on this point Judge Snyder on p. 587, in delivering the opinion of the Court, says:

."This position is too untenable for serious consideration. The only mode by which creditors can reach the assets of the estate of a deceased person is through the title acquired thereto by the representatives and heirs from the deceased person. If the construction contended for was sustained, the statute would have no effect in any suit against the representatives of a person who died insolvent. For in such case the creditors alone are interested and neither the personal representative nor the heir have any pecuniary interest. There is nothing in the terms or the spirit of the statute to support such a construction."

That case in very important respects resembles the case before us. The personal representative and the witness claiming certain bonds as a gift to her by the deceased were the same person; and yet it was held in effect, that in testifying to the delivery of the bonds in dispute to her individually as a gift or for a valuable consideration she was in effect testifying against herself in her capacity as administratrix of the deceased, and therefore came properly within the words of the statute, as it was in the Code of West Virginia, as well as in spirit she was testifying against the administratrix and those represented by her (in that case only creditors) with regard to a personal transaction had with the deceased by the witness. So in this case Charles W. Seabright, though technically not testifying against the defendants was really testifying against himself as administrator of Louis Seabright and in favor of himself individually, just exactly as Lydia J. Martin in the case above referred to testified against herself as administratix of George Martin in favor of herself individually in reference to a personal transaction with him. The court properly held this could not be done, though on record there was no technical opposition as parties in the suit between Lydia J. Martin personally and Lydia J. Mar-

tin as administratrix of George Martin, she being a party plaintiff in both capacities, just as in the case before us there is no technical opposition between Charles W. Seabright individually and Charles W. Seabright executor of Louis Seabright as parties to the suit, he being a party defendant in both his individual and executorial capacities.

But in construing the statute under consideration we must disregard, as was done in the case of *Martin* v. *Smith*, 25 W. Va. 587, such technical construction and hold, that *against* in this statute does not mean on opposite sides of a suit but as having opposing interests in the suit, though the administrator, executor, heir at law, &c., may happen to be on the same side nominally as plaintiff or as defendant in a chancery cause or may in fact be identically the same person.

It seems to me therefore that even under the statute, as it was worded in the Code of 1868, Charles W. Seabright, though he qualified as executor of Louis Seabright, was incompetent to testify personally, that these bonds and notes were delivered to him as a gift by Louis Seabright. In so doing he testified against himself as executor of the estate of Louis Seabright. But, even as the Code of 1868 was worded, there were other words found in this law which would have sufficed to require the court to suppress his evidence, the admission of which was so obviously contrary to the spirit of this law. It will be of course admitted, that he could not as a witness give such evidence against "the next of kin" of the deceased Louis Seabright. Who is meant in this statute to be the "next of kin" of the deceased? It seems to me that by *next of kin* this statute meant *distributees* of the deceased intestate. An interested witness by this statute is not permitted to testify against the next of kin of a decedent as to a personal transaction with the deceased not because of their blood-relation to the deceased, but simply because they were distributees of such intestate. It would seem to follow, that such a witness as to such a transaction ought not to be allowed to testify against a widow of the decedent, when she is one of his distributees, unless there has been uniformly attached to the phrases *next of kin* the meaning of *nearest blood-relation*, which is its ordinary meaning. But when we examine the decisions, we do not find this primitive meaning al-

ways given to this phrase. This phrase frequently occurs in wills; and while it is true, that the courts interpret it very generally as meaning nearest blood-relation, yet when from the context or other portions of the will it is apparent, that the testator intended to include in the phrase all his distributees, the courts will so construe the phrase and include in it a widow or surviving husband, though to justify such a construction of a will, it must be very apparent, that the testator meant, that it should have this comprehensive meaning according to the decided weight of the authorities. (*Haraden* v. *Larrabee*, 113 Mass. 430; *Garrick* v. *Camden*, 14 Ves. 372; *Levee* v. *Durham and wife*, 60 N. Y. 43; *Johnston* v. *Johnston*, 12 Rich. Eq. 259).

The courts have however, it seems to me, been less strict in confining the phrase *next of kin* to blood-relations, where statutes were to be construed, and have frequently interpreted this phrase to include a husband or wife.

Thus in 15 How. Prac. R. 182 it was decided, that in the statute authorizing a creditor to recover the sum of the next of kin of the deceased, to whom any assets have been paid or distributed, the words "next of kin" did not mean blood-relations but all distributees.

So in *Dewey* v. *Goodenough*, 56 Barb. 54, it was held, that a husband should be regarded as *next of kin* within the section 399 of the Code, because he came within the spirit and intention of the statute.

In *The Merchants' Insurance Company of New York* v. *Inman*, 34 Barb., the words *next of kin* were interpreted to mean any distributee including the widow in a statute thus worded: "Actions against the next of kin of any deceased person to recover the value of any assets that may have been paid to them by an executor or administrator, may be brought against all of the said relatives jointly, or one or more of them, for the amount recovered by each of them." And I doubt not, that in a number of New York statutes other than this one, which statutes are cited in the argument of counsel, the court would have held the phrase next of kin to mean distributees. The court, p. 418 simply say: "The term next of kin (in regard to the remedy) means those to whom under the statute of distributions the personal estate of the deceased would pass."

In *Steele's administrator* v. *Kurtz et al.*, 28 Ohio State Rep. 191, it was decided, that "In an action by the personal representative under statute of 1851 (S. & C. 1139–1140) to recover damages for causing by wrongful act and neglect the death of a woman, who died intestate leaving a husband but no children or their legal representative, the surviving husband within the meaning of this act is the next of kin, and as such entitled to the fruits of any judgment obtained in such action."

From these and other cases, I think, we can safely conclude, that, if all the distributees of a decedent come clearly within the spirit of the statute-law, the phrase *next of kin* used in the statute will be interpreted to mean all distributees of the decedent. If by confining the meaning of these words to nearest blood-relations the obvious purpose of the statute would be defeated, the courts will without hesitation put a broader meaning on the phrase and interpret it, as though the statute had used the phrase "distributee." But when the statute-law of the Code of 1868 was amended, one of the principal objects of the legislature would seem to have been to enlarge the class, against whom a party or intended witness was declared incompetent to testify as to any personal transaction or communication with such witness; and, as we have seen, the classes, against whom such witness could not testify in reference to such subject, was enlarged by placing in it all legatees, devisees or survivors of such deceased persons.

I propose now to consider, who are properly included in this last class, *survivors* of such deceased persons. First, it is obvious, that in this class would be included a surviving partner of the deceased person, who in the case of *Carlton, Chamberlaine & Co.* v. *May & Co.*, 8 W. Va. 245, this Court had decided was not included in any class named in the law, as it was worded in the Code of 1868. If however the legislature had designed to limit this class to surviving partners, it would have used the words "or surviving partner of such deceased persons," rather than the far more comprehensive phrase "or survivor of such deceased person." The section is not a provision particularly about suits in reference to partnerships; there is not a word about partnerships in it; the object of the section is simply to designate the

evidence, which might or might not be competent in "any action, suit or proceeding;" and the class intended to be designated by the words "survivor of such deceased person" includes every person, who by reason of his surviving the deceased becomes as such survivor interested in the subject of the controversy. If this be the true meaning of the word "survivor" as here used, it would include a large number of persons besides surviving partners. It would include tenants by curtesy, tenants by dower, the survivor in a joint tenancy of land, which had been held by a deed to husband and wife, whether such survivor were the husband or the wife, a widower or widow, who by surviving his or her matrimonial partner became a distributee of the deceased wife or husband, and doubtless others, who might become successors of deceased persons in modes which do not now occur to me. It is, it seems to me, impossible to conceive, why successors of any of these sorts should not receive the same protection from the testimony of an interested witness in reference to a transaction had with a deceased person, which a surviving partner now receives. They are survivors of the deceased, as much as he is; and they all need this protection for the precise reason he does, that is, because by death they have been deprived of the testimony of the deceased about this personal transaction between him and the interested witness. If it be right to prohibit the interested witness from testifying against one of these survivors in reference to such matters, a surviving partner for instance, it is just as clearly right to prohibit him from testifying against any other of these survivors, as for instance a widow, who as survivor of her deceased husband is entitled to a certain portion of his personal estate.

In so interpreting our law, as it is now worded, I do not consider that I am giving to its words a strained construction in order to include a class of cases, which obviously come within the spirit of the law. These cases come, I think, almost as clearly within the words of the statute as amended, as they do within its spirit. And I can not hesitate to give this interpretation to our present statute-law, when I review, as I have done, our decisions and see how broad and liberal a construction was given to this statute, even before it was

amended and changed. Our Court has never shown a disposition by adhering closely to the letter of the statute to a o l the spirit and thus defeat its object. And when it has been possible by any fair construction of the language to promote justice by carrying out the obvious spirit of this law, we have not hesitated to do so, though in so doing we may have applied the law to transactions and to cases not perhaps immediately in the eye of the legislature. Our cases, which to some extent I have reviewed, evidently proceed on the supposition, that the legislature was not in this act attempting to make provisions for particular cases but was laying down general rules of evidence to be applied by the courts in all cases, which came within the spirit of the law. And this our Court has freely done, except where they felt it impossible to apply the law, though the case may have been apparently within its spirit, without doing open and palpable violence to the words of the statute. This we could not do. But this is no such case. It not only comes plainly within the spirit but almost as plainly within the letter.

We conclude therefore, that Charles W. Seabright was in this case incompetent to prove as against the plaintiff, the widow and distributee, the delivery to him as a gift of these notes and bonds on February 13, 1873, by Louis Seabright, this being a personal transaction between the interested witness and Louis Seabright, deceased.

The court below entertained these views; for on December 11, 1882, the court on the motion of the plaintiff ordered, "that the part of the depositions of C. W. Seabright stating personal communications with Louis Seabright in the absense of the plaintiff be and the same are hereby suppressed." But as the court below in its final decree of October 11, 1884, found, that " said notes before his death had been delivered to the defendant, C. W. Seabright, by him the said Louis Seabright during his lifetime, as a gift to C. W. Seabright and Henry Seabright," it is obvious, that it reached this conclusion from evidence before it other than the testimony of C. W. Seabright.

Was the court below after excluding from its consideration the testimony of Charles W. Seabright on this subject justified by the remaining testimony in the cause in reaching

any such conclusion? From the cases heretofore cited it appears, that the burden of proving the gift by Louis Seabright to Charles W. Seabright and Henry Seabright of these notes was upon them. But this burden is much heavier when the gift is *causa mortis*, than when the gift is *inter vivos*. It would seem therefore proper, that we should determine, whether under all the circumstances, if we were to assume, that these notes were delivered as claimed by Louis Seabright to Charles W. Seabright on the 13th of February, 1873, such a gift would be regarded as a *donatio mortis causa* or as a gift *inter vivos;* as upon this depends the strength of the proof necessary to establish the delivery of these notes as a gift.

A *donatio causa mortis* is a gift of personal property made by a party in contemplation of the supposed approach of death subject to the following implied conditions subsequent attached by law, the occurring of any one of which will operate a defeasance of such gift: 1st, If the contemplated danger of death passes by without the donor dying; 2nd. If the donor should think proper to revoke the gift before his death; or 3rd. If the donee should die before the donor. Formerly in England it was denied, that a promissory note of a third person payable to the donor could be the subject of a gift *causa mortis*, though it was admitted, that the bond of a third person payable to the donor could be the subject of such a gift. (*Miller* v. *Miller*, 3 P. Wms. 356; *Gardner* v. *Parker*, 3 Madd.; *Duffield* v. *Elwes*, 1 Bligh N. S. 543). But it is now perfectly well settled at least in this country, that a promissory note, a bond or any instrument in writing, which creates a liability against a third person, and which is held by the donor and is his property either legal or equitable, is the subject of a valid *donatio causa mortis*. It is a matter of no importance, whether the *chose in action*, the subject of the *donatio causa mortis*, be the note or bond of a third person, or whether, if a note, it be payable to bearer or be endorsed in blank, or whether it be payable to the donor only, and he does not endorse it; it not being now regarded as at all necessary, that the legal title to the chose in action should pass by the delivery of it by the donor to the donee as a gift *causa mortis*, but it being sufficient, that by

the delivery of the chose in action by the donor to the donee as a gift *causa mortis* the equitable title to such chose in action passes and vests in the donee by delivery. (*Lee* v. *Boak*, 11 Gratt. 182; *Wells* v. *Tucker*, 3 Binn. 366; *Harring* v. *Edwards*, 11 Md. 424; *Constant* v. *Schuyler*, 1 Paige 319, 318; *Westuto* v. *De Witt*, 36 N. Y. 340; *Holly's Administrator* v. *Adams*, 16 Vt. 306, 311; *Smith* v. *Kittridge et al.*, 21 Vt. 238, 242; *Grover* v. *Grover*, 24 Pick. 216, 264, 366; *Sessions* v. *Moseley*, 4 Cush. 87; *Borneman* v. *Sidlinger*, 15 Me. 429; *Parker* v. *Marston*, 27 Me. 196, 209; *Brown's Executor* v. *Brown*, 18 Conn. 410, 413; *Jones* v. *Dyer*, 16 Ala. 221; *Rhodes* v. *Childs*, 14 P. F. Smith 18; *Gourley* v. *Listenbigler*, 1 P. F. Smith 345).

The history as well as the present condition of the law is satisfactorily given by Shaw C. J. in *Parish* v. *Stone*, 14 Pick. 198–205. This is unquestionably the settled law as to gifts *causa mortis*; and it would seem, that the distinction at one time taken, which would uphold the delivery of a *chose in action*, which would not pass the legal title to it, such as a bond or promissory note not payable to bearer, as a valid gift *causa mortis*, and would not uphold such a delivery of a *chose in action* as passed only the equitable title as a valid gift *inter vivos*, would now be disregarded. Such a gift accompanied by such delivery, as would pass the equitable title to a *chose in action*, being held sufficient to make a *valid* gift *inter vivos* as well as a gift *causa mortis*. (*Camp's Appeal*, 36 Conn. 88; *Sessions* v. *Mosely*, 4 Cush. 87).

It is now and always has been held by the courts, that, to make any gift of personalty valid, as a gift *inter vivos* or *causa mortis*, delivery is absolutely necessary. (*Ewing* v. *Ewing*, 2 Leigh 337, 341, 344; *Barker* v. *Barker's adm'r*, 2 Gratt. 344; *Miller's wife* v. *Jeffray et al.*, 472, 479; *Lee* v. *Luther*, 3 Woodbury & Minot 519; *Sessions* v. *Mosely*, 4 Cush. 87; *Brown* v. *Hurd, adm'r*, 10 Mass. 427, 429; *Hobb* v. *Hobb*, 5 Gill. 516; *Tate* v. *Hübert*, 2 Ves jr. 120). But such delivery may be to a third person for the use of the intended donee. (*Constant* v. *Schuyler*, 1 Paige 316, 318; *Wells* v. *Tucker*, 3 Binn. 366; *Sessions* v. *Mosely*, 4 Cush. 87). Or it may be delivered to one of several donees for the use of all. (*Dresser* v. *Dresser*, 46 Me. 48). But no gift whether *inter vivos* or

*causa mortis* has ever been sustained by the courts in this country or in England without a delivery of the subject of the gift or of a deed transferring the title. One of the reasons for this is to avoid fraud or perjury. This reason is thus stated by the assistant vice-chancellor in *Brinckerhoff* v. *Lawrence*, 2 Sandt. Ch'y 406 :

" There are many strong exceptions in the books of the common law against sustaining donations either *mortis causa* or *inter vivos* without actual delivery. The reason of this is that gifts of both classes are usually claimed upon parol evi- and unsustained by any writing; and the courts have uni formally set their faces against such claims on account of the great danger of perjury. Where the interest is proved under his own hand, there is no such danger, and the courts have accordingly presumed a delivery on slight evidence."

But the only reason for requiring a delivery of the subject of a *donatio mortis causa* or a gift *inter vivos*, in order to make the gift valid, is not simply to avoid perjury, but because, till there be a delivery, the subject of the gift remains under the control of the person claimed to be the donor, and though the writing whether delivered or not may show satisfactorily the intent to make a gift, yet without a delivery the transaction is as incomplete, where there is written evidence of the intent, as where there is no such evidence. An actual transfer is essential and that, though the intent to transfer be ever so clearly stated in writing; and it has been a question of controversy, whether the delivery even of a deed could supply the want of the delivery of the subject of the gift itself; but the weight of authority seems to be, that the delivery of a deed of gift may pass the title to chattels or *choses in action* the subject of the gift, though the subjects of the gift are not actually handed over to the donor; but in such case the deed itself must be delivered to the donee, if the subjects of the gift are not themselves delivered ; there must be a delivery of one or the other. (*Gilmore* v. *Whitesides*, Dudley's Eq. 14; *Nicholas* v. *Adams*, 2 Wharton 17, 24; *Jones* v. *Smallpiece*, 2 M. & S. 551, 554; *Means* v. *Means*, 22 Vt.). But it makes no difference if the donor's intention is set forth in writing, unless the instrument is in point of fact delivered. (*Payne* v. *Powell*, 5 Rush 248 ; *Phipps* v. *Hope*, 16 Ohio N.

S. 594; *Davis* v. *Boyd*, 6 Jones 249; *Thomson* v. *Thomson*, 2 How. 745; *Pringle* v. *Pringle*, 9 P. F. Smith 281).

In determing whether a gift be a *donatio causa mortis* or a gift *inter vivos* the courts are largely influenced by the circumstances surrounding the donor, when the gift is made. To constitute the gift a *donatio causa mortis*, the donor must make the gift in contemplation of the supposed approach of death. By the civil law, to make a *donatio causa mortis*, it was enough, it the donor was moved to make the gift by the general apprehension of death as the common lot of humanity. But then the gift had thrown around it many requisites intended to protect the representatives of the donor, which the common law did not throw around such gift. One of these was, that the donor in making the gift should declare, what moved him to make it. While the older cases in England apparently were based upon the law, as I have laid it down above, yet they did not lay down the law with much distinctness as to how definite the apprehension of death should be; but they evidently generally proceeded on the idea, that the expectation of death must be an expectation essentially different from that required by the civil law, must be more than a general apprehension of death as the common lot of humanity. In the leading case of *Nicholas* v. *Adams*, decided in 1826, (2 Whart. 17), Chief Justice Gibson gave the whole subject a careful examination, in which he lays it down, that it is indifferent, whether the peril of death, under which a gift *causa mortis* is made, be induced by sickness, which might perhaps have been interred from the English cases, or whether it proceeded from any other cause. In this he was clearly right; and his views in this respect have been very generally followed by the American cases.

But in this connection he used language, which was too broad and tended to mislead. He says : "A groundless apprehension of death is necessarily as operative to make a gift conditional, as if the danger was real ;" and he adds : "I would therefore define a *donatio causa mortis* a conditional gift dependent on the contingency of expected death." This language gives too much countenance to the notion of the civil law, that a small apprehension of death, as when a soldier enlists in a war or is going to the front with the expec-

tation, that he may engage the enemy, is sufficient to sustain a *donatio mortis causa*. But such a general apprehension of death is by the American decisions held insufficient to support a *donatio mortis causa*. The giver must make a gift *causa mortis* with reference to a particular cause of death, which, he thinks, then exists, and which may result in his death. (*Gourley* v. *Luisenbigler*, 51 Pa. St. 345; *Irish* v. *Metteng*, 47 Barb. 370; *Smith* v. *Dorsey*, 30 Ind. 451; *Craig Kittridge*, 46 N. H. 57). These views are sustained by the modern English decisions. (*Duffield* v. *Elewes*, 1 Bligh N. S. 497; *Edwards* v. *Jones*, 1 Myl. & Cr. 232).

Whenever however a gift is made in a donor's last illness a few days or weeks before his death, though nothing be said by the donor to indicate, that he was contemplating that such illness might prove fatal, it will nevertheless be presumed to be a gift *causa mortis* not *inter vivos* (*Gardner* v. *Parker*, 3 Madd. 184; *Lawson* v. *Lawson*, 1 P. Wms. 441; *Miller* v. *Miller*, 3 P. Wms. 356; *Walter* v. *Hodge*, 2 Swans. 100; *Meachham* v. *Meachham*, 24 Vt. 49; *Delamotte* v. *Taylor*, 1 Redf. 417–421). In *Nicholas* v. *Adams*, 2 Whart. 17–22, Chief Justice Gibson says: "There may doubtless be a conditional gift when death is not expected; but in that case the condition would have to be expressed and the contingency specified; in *donatio mortis causa* both are implied from the occasion." These conditions thus implied in every *donatio mortis causa* are: First, if the *donor* recovers, or secondly revokes the gift, or thirdly survives the donee, the gift will be defeated (*Merchant* v. *Merchant*, 2 Brad. 445). These, it seems to be universally admitted, are conditions, which the common law, as did the civil law, attach to every *donatio causa mortis*. There are many *dicta* to that effect, and none to the contrary. (*Nicholas* v. *Adams*, 2 Whart. 22; *Parker* v. *Marstin*, 27 Me. 186). These are all conditions subsequent, on the occurring of which the gift *causa mortis* is defeated. There are no conditions precedent attached to a *donatio causa mortis*, though there have been cases, which apparently held, that a gift *causa mortis* did not take effect till the death of the donor. But these cases are the result of a failure to consider the difference between conditions subsequent and conditions precedent. There can, I con-

ceive, be no question, that a *donatio mortis causa* is a gift *in presenti* liable to be defeated by the occurring of any of these conditions subsequent. It has been so held, whenever there was a due consideration of the question. (*Jones v. Selby*, Pr. Ch. 300; *Nicholas v. Adams*, 2 Whart. 22).

But, as before stated, it has in several cases been assumed, as I think, thoughtlessly by judges, that a "*donatio causa mortis* leaves the whole title in the donor, unless the event occurs, which is to divest him." This is said for instance by Lord Cottenham in *Edward v. Jones*, 1 Myl. & Cr. 226. As I understand him, he proceeded in his reasoning on the assumption, that a *donatio causa mortis* was not a gift *in presenti*, and that when such a gift was made, it did not operate to pass the title to the *chose in action in presenti*, but the title remained in the donor till his death, that is, as he expressed it above "till the event (*i. e.* the donor's death) occurs, which is to divest him," that is, as I understand him, to divest him, the donor, of his title to the *chose in action.* This is, it seems to me, clearly a misapprehension of the nature of a *donatio causa mortis.* It is regarded, as though it was not a present gift to be defeated by the recovery of the donor, but as a gift, which is not to take effect till the death of the donor. It may seem that, such a misapprehension of the nature of this gift would practically produce no evil consequencee. But this is not so. It led Lord Cottenham in this very case to what, I conceive, was if not a false conclusion at least a conclusion, which was indefensible on the grounds, upon which he based it.

In this case of *Edwards v. Jones*, 1 Myl. & Cr. 226, M. C., the obligee in a bond, five days before her death signed an endorsement not under seal upon the bond the subject of controversy as follows: "I, M. C., do hereby assign, transfer the within bond or obligation, and all my right, title and interest thereto, and to the use of my niece, E. E., with full power and authority for the said E. E. to sue for and recover the amount thereof, and all interest now due, or hereafter to become due thereon." It was argued, that, if the gift could not in consequence of its being incomplete take effect as a *donatio inter vivos,* it would take effect as a *donatio causa mortis.* Lord Cottenham held, that it could not take effect as a *donatio*

*causa mortis,* as an absolute and irrevocable gift was intended. His lordship said :

"A party making a *donatio mortis causa* does not part with the whole interest save only in a certain event; and it is the essence of such a gift that it shall not otherwise take effect. A *donatio mortis causa* leave the whole title in the donor, unless the event occurs which is to divest him. Here however, there is actual assignment by which the donor M. C., transfers all her right, title and interest in the subject to her neice; and that is really the whole evidence of the transaction ; for the testimony of several persons who were present, proves that it was intended as a gift; and though others speak as to an intention being expressed, inconsistent with the written document, very little attention can be paid to statements of what passed, when contradicted by the act of the party as evidenced by a written instrument.   *   *   *

 * There is not very precise evidence as to the time when these bonds got into the possession of the plaintiff. There is also a defect of evidence, to show that at the time at which the transaction took place M. C. was in such a state of illness or expectation of death as would warrant a supposition that the gift was in contemplation of this event. These considerations however do not appear to be very material because I consider the language of the assignment itself to exclude the possibility of treating this as a *donatio mortis causa.*"

It seems to me, that the case of *Meach* v. *Meach et al.,* 24 Vt. 591, though not entirely satisfactory in its reasoning is far sounder than the English case. In that case M. in prospect of death being sick made a deed to his wife of all his real estate, and at the same time he made a separate deed to her of all his personal property consisting of stock on his farm and *choses* in action. These deeds were duly recorded. M. continued hopelessly sick, till he died about a month afterwards. It was held for reasons not necessary to be stated, that the deed conveying the land to the wife was void ; but that the deed of the personalty was valid as a *donatio mortis causa.* Confining our abstract of the opinion of the court delivered by Chief Justice Radfield to such parts of it, as referred or applied to the *choses* in action conveyed absolutely by the deed of the husband to the wife, on page 597 he says :

·· "This case combines, we believe all the essential facts requisite to constitute a good *donatio causa mortis* by the common law and many of these strikingly identical with the very words used by the civil law writers in defining these gifts.
* * * * * * It was made during the last sickness, in the prospect of certain and speedy departure, to take effect fully after death only. It was but a rational and reasonable gift under the circumstances, and was intended to become inoperative in case of the recovery of the donor from that sickness, or his surviving the donee, or changing his intention. All these incidents are not fully set forth in the instrument of donation, and we do not find it is essential to the validity of such a gift. In case of a transfer of property by deed nothing remains to perfect the gift. It does not remain *in choate*, or incomplete or in any sense revocable after the delivery of the deed. * * In examining the case, it occurred that some might object to this deed as a gift *mortis causa*, inasmuch as it does not in terms, very explicitly provide that the gift should only take effect after the donor's death. In a verbal gift this is often implied from the attending circumstances. But the gift being by deed, we are, in a measure, confined to its terms, construed with reference to the attending circumstances. And as this deed proposes in terms to convey not only all the donor's property at the date, but all of which he should possess at his decease, it is fair, we think, to give the words this signification, that the donee's full right under the deed should not become absolute and perfect, except in the event of the donor's death. But if this is doubtful, there is no doubt a court of equity would lend its aid to perfect the deed in this particular."

In *Grymes* v. *Howe*, 49 N. Y. 17, it was decided, that, where the defendant's testator being the owner of 120 shares of bank-stock included in one certificate made an *absolute* assignment in writing of twenty shares to the plaintiff, handing it to his wife to be kept by her and delivered to the plaintiff upon his death, the donor being at the time of executing the assignment about eighty years of age in failing health, and continuing so until his death, which occurred about five months thereafter, this was a valid gift *mortis causa ;* that the equitable title to the stock passed by the assignment; that

the defendant, the executor of the donor, was trustee for the plaintiff by operation of law to make the gift effectual, and that a judgment requiring him to produce the certificate and to cause a transfer of the twenty shares to be made to the plaintiff was proper. The court in that case held, that " to constitute a valid gift *mortis causa*, three things are necessary : 1st. It must be made with a view to the donor's death. 2d. The donor must die of the ailment or peril. 3d. There must be a delivery. It is not necessary that there should be an express qualification in the transfer or the delivery; it may be found to be such a gift from the attending circumstances, although the transfer or delivery be absolute."

The law as thus held is, it seems, in strict conformity to the view, which we have above expressed, and is well sustained by the decisions. It may be questioned, whether this law was properly applied to the facts as developed in that case, but I do not think, that the law as above laid down by the court is questionable. Peckham, judge, in delivering the opinion of the court says : "The declaration of the donor that his wife should keep the assignment and not hand it over till after his death, as he did not know what might happen, and that they (the donor and his wife) might not need it, was simply a statement of the law, as to such a gift, whether the declaration was or was not made. Clearly he could not tell whether he would die or recover from that ailment. If he did recover the law holds the gift void. The transaction as to such gift is, the donor says, I am ill and fear I shall die of this illness ; whereupon I wish you to take these things and hand them to my grand daughter after my death ; but do not hand them to her now, as I may recover and need them. A good *donatio mortis causa* always implies all this. If delivered absolutely to the donee in person, the law holds it void in case the donor recovers, and he may then reclaim it. *Staniland* v. *Wellott*, 3 Mal. & Gor. Ch'y R. 664. To make a valid gift *mortis causa* it is not necessary there should be any express qualifications in the transfer or delivery. It may be found to be such a gift from the attending circumstances though the written transfer and delivery may be absolute. See last case above cited."

Whatever may be said or thought about the application

of the law to the facts in that case, I think there can be no question that the law as laid down in the last two sentences of the opinion above quoted is clearly law, though it would be impossible to reconcile it with the opinion of Lord Cottenham above cited from *Edward* v. *Jones*, 1 Myl. & Cr. 226. Instead of reaching as he did the conclusion, that "the language of the assignment itself" (which was absolute) "excludes the possibility of treating this as a *donatio mortis causa*," he would have reached, a conclusion much more consonant with the law, had he said that "no assignment of a *chose in action*, however absolute may be its language, can possibly exclude the court from treating the gift as a *donatio mortis causa*, if the surrounding circumstances, when it was made, clearly lead to the conclusion, that it was such a gift." For as *donatio mortis causa* is a present gift, the proper mode of making the assignment of such a gift *causa mortis*, when the gift is a *chose in action*, is to make the assignment absolute, as though it were a gift *inter vivos*. The error of Lord Cottenham, which led to his false conclusion, was, as he expressed it, "a *donatio causa mortis* leaves the whole title in the donor, unless the event" (death) "occurs, which is to divest him." This is a very inaccurate statement of the law, and it led to his mistaken conclusion above stated.

On this subject, Mathews, justice, in delivering the opinion of the Supreme Court of the United States in *Basket* v. *Hassell*, 107 U. S. R. 602 says, in speaking of an extract, which he had quoted from *Gass* v. *Simpson*, 4 Cald. 288:

"In the first of these extracts there is an inaccuracy of expression which seems to have introduced some confusion if not apparent contradiction when after having stated that 'the property must pass and not be intended to pass at the giver's death' it added that 'until the event occurs which is to divest him, the title remains in the donor.' But a view of this entire passage leaves no room to doubt its meaning; that a *donatio causa mortis* must be completely executed, precisely as required in cases of gifts *inter vivos*, subject to be divested by the happening of any of the conditions subsequent; that is upon actual revocation by the donor, or by the donor's surviving the apprehensive peril, or out living the donee, or by the occurrence of a deficiency of assets necessary to pay the

debts of the deceased donor. These conditions are the only qualifications that distinguish gifts *mortis causa* and *inter vivos.* On the other hand, if the gift does not take effect as an executed and complete transfer to the donee of the possession and title either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will."

The syllabus in this case is :

"A *donatio mortis causa* must be completely executed, precisely as required in the case of gifts *inter vivos* subject to be diverted by the happening of any of the conditions subsequent; that is upon actual revocation by the donor, or by the donor's surviving the apprehended peril, or outliving the donee, or by the occurrence of a deficiency of assets necessary to pay the debts of the deceased donor and if the gift does not take effect as an executed and complete transfer to the donee of possession and *title* either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will. Therefore though a certificate of deposit is a subsisting *chose in action* and represents the fund it describes, as in cases of notes, bonds and other securities, so that the delivery of it is as a gift constitutes an equitable assignment of the money for which it calls, yet a delivery of a certificate of deposit to the intended donee with an indorsement thereon which limits and restrains the authority of the donee in his collection of the money, so as to forbid its payment until the donor's death, is not valid as a *donatio mortis causa.*"

It is obvious, that such an indorsement of a note or bond would upon this reasoning, which seems to me to be entirely sound, defeat the gift either as a gift *inter vivos* or *causa mortis,* and that therefore an indorsement of such note or bond professing to transfer it immediately would, when accompanied by delivery only, have the effect of making the transfer perfect and thereby making it a gift *in presenti;* but whether it was a gift *inter vivos* or *causa mortis* could not be determined by such an absolute indorsement on it intended only to show a completed gift *in presenti,* but must be determined by the surrounding circumstances, just as the character of any other gift *in presenti* would have to be determined. Instead there-

fore of considering such absolute indorsement and assignment of the bond or note to the donee as conclusive evidence, that it was a gift *inter vivos* and not *causa mortis*, it seems to me to be in itself no evidence whatever, and that it only shows, that it is a gift *in presenti*, which may be a gift *inter vivos* or *causa mortis*. Both of such gifts are always gifts *in presenti*.

The Roman law did not allow a gift *causa mortis* of the whole or of much the larger part of the personal estate of the donor; and there is a recent American case, which decides, that under the common law no such gift *causa mortis* could be made of the whole of one's personal estate. (*Headley* v. *Kirby*, 18 Pa. St. 326; *Meach* v. *Meach*, 24 Vt. 597). Until this Pennsylvania decision there was no decision either in England or in America, where an attempt was made by the courts to limit the operation of a gift *causa mortis* on account of the comparative or absolute extent of the property so disposed of. And despite this decision the fact, that a gift constitutes the principal or whole of the donor's personal property, can not by the courts be held to necessarily prevent such gift from taking effect. (*Michener* v. *Dale*, 23 Pa. St. 50). Such limitation of the extent of a gift whether *inter vivos* or *causa mortis* can be brough about at this late day only by legislation. But, where a gift either *inter vivos* or *causa mortis* of almost the whole of the donor's personal estate is attempted to be set up, the courts may very properly require the most clear and satisfactory proof of the delivery of the property as a gift *inter vivos* or *causa mortis*, but they can go no further. Chief Justice Redfield in *Meach* v. *Meach et al.*, 24 Vt. 593 well says : "Men that have property do not ordinarily part with it at once, and without reluctance, even into the hands of a most tried friend. This is such a reversal of the relations hitherto subsisting between a grantor and grantee that nothing but the certainty and nearness of death could have induced the change. It is in vain to effect to convince us that any less motive could form the prevailing consideration for such transaction.

It seems to me therefore, that, whenever a gift of almost the whole of the donor's personal property is set out, not only must there be the strongest evidence to show beyond doubt, that the property was delivered to the donee as a gift,

but, even if this evidence was produced, and the delivery of such property as a gift was fully and satisfactorily established, there would be from the very extent of the gift a strong presumption, that it was not an absolute gift *inter vivos* but a gift *causa mortis*, if there were any circumstances surrounding the donor, which tended to show, that such was the case.  For it seems almost impossible to conceive, that any person would make a gift *inter vivos* to take effect immediately and to be incapable of revocation in any manner or by the occurrence of any future event of almost the whole of his personal estate, especially if such personal estate was large.  Such gift he might make perhaps as a gift *causa mortis*, which would be revocable at his pleasure or would be revoked, if he recovered from his present sickness.  But an unconditional gift of a large personal estate, whereby he was left a very scant sum to pay for his necessary expenses, is so improbable, as to require proof of the strongest character.  The evidence in any case necessary to establish any gift *causa mortis* must be clear and satisfactory and such, as gives rise to no suspicion of undue influence.  ( *Walsh* v. *Studdart* 4 D. & W. 159 ; *Thompson* v. *Heffernan, Id.* 285 ; *Cosnahan* v. *Grice*, 15 Moo. P. C. C.). These cases are referred to as establishing this position in White and Tudor's Leading Cases in Equity, vol. 1 part 2 old-paging 934 new paging 1,228.  Though I have not access to these cases, yet the law as above laid down is doubtless correct, as it is supported by other cases.  Thus in *Miller and wife* v. *Jeffrees et als.*, 4 Gratt. 472, it was decided :

"A delivery is indispensable to the validity of a *donatio mortis causa.*  It must be the actual delivery of the thing itself, or of the means of getting the possession and enjoyment of the thing ; or if the thing be in action, of the instrument by the using of which the *chose* is to be reduced into possession.  It is not the possession of the donee, but the delivery to him by the donor, which is material in a *donatio mortis causa.*  An after acquired possession of the donee is nothing ; and a previous and continuing possession, though by the authority of the donor is no better."

*Concklin* v. *Concklin*, 27 New York, (20 Hun. 279) was an action brought by the plaintiff, administrator of a decedent, against the widow for property, which, the administrator

claimed, belonged to his intestate at the time of his death, which the defendant his widow held and refused to deliver up to the plaintiff on his demand. The answer admitted the plaintiff's appointment as administrator of her deceased husband's estate, and that the intestate owned the lands in his lifetime, but averred, that prior to his decease they became the property of the defendant by a *donatio mortis causa*, and that she then took and thereafter continuously kept possession of them. It was decided, that on the widow claiming to be the donee was the burden of establishing the alleged gift. In that case she testified, that a few days before her husband's death she took possession of the bonds and kept possession of them till her husband's death. The court decided, that this proof was insufficient as between husband and wife to show a change of possession or delivery of the bonds. In this case the court concurred in the good sense of the observations of a judge who said :

"If any presumption of title is to prevail by mere possession (which this judge questions), it is only when the possession is free from suspicion. It is not a defence to show that the defendant, a member of the family of the deceased, and hence having access to his papers, is found in possession of a note owned by deceased at or about the time of his decease. To establish such rule would be dangerous. It leads into too great temptation."

The court held, that the mere fact of possession of property shown to have belonged to a deceased person a few days before his death by relatives or persons residing in the same family and having access thereto is not satisfactory or even *prima facie* evidence of title. As cases showing the disposition of the courts in order to make a *donatio mortis causa* valid to require strong proof to show it was a completed and perfected gift see *First National Bank* v. *Baldwin*, 35 Conn. 351 ; *Prickett* v. *Prickett's administrator*, 5 C. E. Green (20 N. J. Ch'y) 478 ; *Dilts et al* v. *Stevenson*, 2 C. E. Green (17 N. J. Ch'y) 413 ; *Webster* v. *Wise & Ford*, 1 Paige 319 ; *Grey et al* v. *Grey*, 47 N. Y. 552 ; *Cutting* v. *Gilman*, 41 N. H. 152. The delivery of the possession to the donee to perfect a gift *inter vivos* is necessary ; but the courts require less stringent proof of delivery to establish such gifts than to establish

gifts *causa mortis*, as there is usually less opportunity to set up a fraudulent pretence of a gift *inter vivos* than of a gift *causa mortis*. As evincing the character of proof required when the gift is *inter vivos* see *Hanson* v. *Millett*, 35 Me. 184; *Sessions* v. *Moseley*, 4 Cush. 87. Schouler on Personal Property, sec. 171 lays it down thus:

"Indorsement or assignment, in accordance with the tenor of the instrument, shows, doubtless, the gift intention most conclusively. But assuming that the chattel may be sufficiently given by the delivery of the muniment alone, the evidence of the actual gift, should, nevertheless, be clear and consistent throughout. Hence an indorsement or assignment without parting with the thing appears too equivocal to establish delivery; and if on the other hand, indorsement or assignment of the instrument be begun and not completed by the donor, the presumption should be that the gift is insufficiently executed."

To support these propositions he refers to 8 Ir. Eq. 609; *Basket* v. *Hassell*, 107 U. S. 602, and *McGrath* v. *Reynolds*, 116 Mass. 566. The first of these authorities is inaccessible to me. In the last case it was decided:

"A written instrument not duly attested as a will, by which a sum of money is given to another for certain purposes named, and for the purpose of carrying out its provisions delivered to him a saving bank book with an order for the payment of the deposits, which made up only a smaller portion of the sum named in the instrument. The donor when asked by C. where the remainder was, said it was in his trousers pocket, turning in his bed and looking to the closet in which the trousers were and that E. who owned the house who was present would give it to him. After the donor's death E. delivered the money to A. Held that there was no sufficient delivery to give effect to the gift as a *donatio causa mortis* and that it could not take effect otherwise than as an entire gift."

In delivering the opinion of the court Wells, judge, says: "Gifts *causa mortis* require actual delivery or its equivalent. (*Parish* v. *Stone*, 14 Pick. 198, 203; *Rockwood* v. *Wiggins*, 16 Gray 402; *Marshal* v. *Berry*, 13 Allen 43; *Coleman* v. *Parker*, 114 Mass. 30; see also cases cited in 2 Redfield on Wills 302,

*et seq.*, and 1 Leading Cases in Eq. 583, notes to *Ward v. Turner.*)  *   *   *   *   We are forced to the conclusion, that there was a failure to make the intended gift effectual in law, by reason of an omission to perfect it by delivery of the money.  As there was no intention to make the gift otherwise than as a whole, the failure of the principal part must defeat the whole.  We can not regard the delivery of the bank books as a delivery of the part in the name of the whole, so as to make the gift effectual.  We need not consider the question whether the deposits in the saving bank would pass as a *donatio causa mortis* by delivery of the books, with the order of payment or the assignments, if disconnected with the rest of the scheme.  The intended gift was not of those deposits or books specifically, but of a definite larger fund and the books were delivered merely as a means in part to carry out the entire purpose.  That purpose failing, there is no intended gift of which the delivery of those books is an appropriate manifestation."

The substance of the case of *Basket v. Hassel*, 107 U. S. 602, has been hereinbefore stated.  The transaction was as follows: H. M. Chaney held a certificate of deposit in these words—

"Evansville National Bank,

"Evansville, Ind., September 8, 1875.

"H. M. Chaney has deposited in this bank $23,514.70, payable in current funds, to the order of himself, on surrender of this certificate properly endorsed with interest ot the rate of 6 *per cent. per annum*, if left for six months.

"Henry Reis, *Cashier.*"

Chaney being in possession of this certificate at his home in the county of Sumner, State of Tennessee, during his last sickness and in apprehension of death wrote on the back thereof the following endorsement:

"Pay to Martin Basket, of Henderson, Kentucky, no one else; then not till my death.  My life seems to be uncertain.  I may live through this spell.  Then I will attend to it myself.          (Signed.)

"H. M. Chaney."

Chaney then delivered the certificate to Basket and died without taking it back in January, 1876.  The court held,

that if this had been an indorsement directing the money to be paid to Martin Basket absolutely, it would have been a valid gift not *inter vivos* but *mortis causa*; that Basket could nevertheless in such case have collected from the bank the whole amount of this certificate in the lifetime of H. M. Chaney the donor. But if this gift was only a gift *causa mortis* either by the act of the donor or by the operation of law, the donor recovering from that spell of sickness, the donee would have been under obligation to return the certificate, if uncollected, or the money, if collected and he would have had a perfect right to collect it. But as by the special indorsement the donee had no right to collect the certificate of deposit till the donor's death, it was not a *present executed gift causa mortis* but only in its nature a testament, which not being executed, as wills were required to be executed, was null and void. The court say:

"It can not be said that the condition in the indorsement, which forbids payment till the donor's death, was merely the condition attached by law to every such gift. Because the condition which inheres in the gift *mortis causa* is a subsequent condition. In the meantime the gift is executed, the title has vested, the dominion and control of the donor has passed to the donee. While here the condition annexed by the donor to his gift is a condition precedent, which must happen before it becomes a gift, and as the contingency contemplate is the donor's death, the gift can not be executed in his lifetime and consequently can never take effect."

I will now apply the law as above laid down to the facts as shown by the record in this cause. I have set out these facts at much length in the statement of this case, and they need not be repeated. So far as it is necessary to apply the law as stated above, they are substantially these. Louis Seabright died in February, 1873, having been in bad health for several weeks before his death, the result probably of his dissipated habits, and being unable to attend to his own business he put it all in the hands of his half brother, Charles W. Seabright, with directions to collect his debts and pay what he owed. He placed in Charles's hands upwards of $22,000 worth of property represented by a large number of bonds and notes, probably more than forty, secured on real estate.

This was about one month before his death, and shortly thereafter, in a week or two, he was taken so sick as to be confined to his room and generally to his bed and was attended daily by a physician. He had quarrelled with his wife, and separated from her several months before; and she had brought a suit against him for a divorce. He had broken up housekeeping and rented his homestead to one Weidebusch who kept the house as a tavern or boarding house and Seabright boarded with him. It is a fair inference from the evidence, that because of these relations with his wife he concluded to prevent, as far as he could, her receiving any of his property after his death. To effect this object, as he could not prevent her from having dower in his real estate, he concluded, that, if he could, he would so arrange his personal estate as to deprive her of any of it after his death. He saw his general agent, his half brother Charles W. Seabright, probably after his health had become such, that he was confined to his room and was attended daily by a physician, and consulted him as to how these notes and bonds, exceeding $22,000 in amount, could be assigned to him Charles W. Seabright and to a brother of Louis Seabright one Henry Seabright in a lawful manner; and he advised, that it should be done by one Kammer, a justice of the peace, who could do it properly, and he was seen. It was intended, that Henry Seabright as well as Charles W. Seabright should be present, when this was done; but Henry Seabright could not be found not being at home; but Kammer was found and brought to the room of Louis Seabright, who had gotten up and was sitting at a table, and in the presence of Weidebusch and Charles W. Seabright Louis Seabright, to whom these notes had a few days before been returned for this purpose, handed them one at a time to Kammer sitting on the other side of the table, who indorsed on each of them an absolute assignment for value received to Charles W. Seabright and Henry Seabright and then handed them back to Louis Seabright, who signed his name to the indorsement; and, so far as the evidence shows, they were retained by Louis Seabright and not handed over to or delivered in any way to Charles W. Seabright. It is true that he says they were then delivered to him by Louis Seabright as a gift to him and Henry

Seabright; but his testimony is inadmissible as evidence on this point, as we have seen. The deposition of Kammer was not taken; and the deposition of Weidebusch, which was taken, simply proves the facts as above stated, and he does not say one word about Louis Seabright after he had signed these indorsements written by Kammer handing these notes, bonds or any of them to Charles W. Seabright, who was present, or of his delivering them or any of them to him. It is true he does not say the contrary. He is asked no question as to what was done with these notes and bonds, after this indorsement had been signed on each of them. Of course the burden of proof of this delivery was on those, who claim them to be gifts, their delivery or something equivalent being, as we have seen, absolutely necessary to perfect a gift of them, whether it was a gift *inter vivos* or a gift *causa mortis.*

These notes and bonds constituted certainly nineteen twentieths of Louis Seabright's personal estate and perhaps ninety nine hundredths of it. His real estate was about equal in value to his personal estate including these bonds. What income he got from it does not appear. Instead of its being proven, that these bonds and notes were, after this indorsement was made on them, handed over or delivered by Louis Seabright to Charles W. Seabright for him and Henry Seabright, it seems to me most probable, that they were retained by Louis Seabright till his death, which occurred eight days afterwards. If they had in fact been so delivered, it seems to me, that it would have been proven by Weidebusch, when he was examined; for if it was true, he certainly knew it, being present. And the claimant of these bonds and notes, when his deposition was taken, must then have known of the absolute necessity of their proving this delivery, in order to perfect the gift. For when the depositions of Charles W. Seabright, one of these claimants, was taken, he attempts to prove this delivery and distinctly testifies to it; but, as we have seen, he is incompetent to prove this delivery. There are other good reasons for concluding, that these bonds and notes were never delivered to Charles W. Seabright after these indorsements were made on them. As Charles W. Seabright had been the agent to

transact all of Louis Seabright's business, so Louis intended that after his death Charles should continue to do so, and accordingly immediately after the endorsement of these bonds and notes he made his will, in which he appointed Charles W. Seabright his executor.

Of course on the death of Louis Seabright all of those bonds and notes would as a matter of course come into the possession of Charles W. Seabright having on their backs this assignment of them for value received to him and Henry W. Seabright. It was very natural for the parties then present, none of them being lawyers, to think, that this was all, that was necessary to give them a perfect title to all those bonds and notes. It is in the highest degree improbable, that Louis Seabright, in order to prevent his wife's getting any of his personalty after his death, would give nineteen twentieths of it away absolutely in his lifetime. As we have seen, the law, so strong is the presumption against a person's making such a gift either *inter vivos* or *causa mortis*, requires very strong proof that such a completed gift had been made, whenever it is claimed to have been done. It is obviously far more probable, that, if such a gift was made, it would have been made rather as a gift *causa mortis* than as an absolute gift.

It seems therefore to me, that there is a failure on the part of the claimants of these bonds and notes to prove any delivery of them and therefore to prove any gift either *inter vivos* or *causa mortis*. But, if we could believe that such gift was perfected, it does seem to me, that the surrounding circumstances show, that it was made in contemplation of death, and was a gift *causa mortis* not a gift *inter vivos*. The nature of the gift whether the one or the other, had it been of some trifling piece of personal property instead of nearly all of the donor's personal estate, would have been very questionable. Perhaps it might have been held, under the circumstances in this case, if such gift had been trifling, a gift *inter vivos;* or perhaps it would have been held to be a gift *causa mortis* on the authorities we have cited. But when we consider, that, if it was a gift at all, it was a gift of more than $22,000.00 or of nearly all of the personal estate of the donor, we must under the authorities hold, that if it had

been perfected as a gift, it would be clearly only a gift *causa mortis.*

As we have seen, the endorsement on these bonds and notes, though an absolute assignment, would not show, that they were not a gift *causa mortis,* the authorities being that such an endorsement only shows clearly the purpose, when the note or bond is delivered, that it is delivered as a present gift.    But as a gift *causa mortis* is a present gift subject to be defeated by conditions subsequent, such indorsement does not show, whether the gift was a gift *inter vivos* or *causa mortis,* and the character of the gift is to be determined in such case as in others by the surrounding circumstances.

If we could regard these bonds and notes as a gift *causa mortis,* the plaintiff, the widow of the donor, would be entitled to her distributive share of them.    Thus in *Gentry et als.* v. *Bailey,* 6 Gratt, 603, 604, Judge Baldwin says:

"These enactments impliedly recognizes the power of the husband, which he had according to the modern common law, to alienate by sale or gift in his lifetime the whole or any part of his personal property. and thereby exclude his wife from any interest therein.    But they depart from the English law in respect to the husband's disposition by will of his goods and chattels, which by that law is effectual against his wife, who can claim no part of what is so bequeathed ; and the effect of them is to secure to the wife her distributive share of whatever personal property belongs to the husband at the time of his death, whether he dies testate or intestate.    This right by our law on the part of the wife, I think it clear, the husband can not defeat by any contrivance for the purpose.    He can not by any device die testate or intestate in regard to his personalty, in such wise as to bar her of her distributive share.    Whatever may be the form of the transaction, if the substance of it be a testamentary disposition by the husband of his property, it can not be effectual in relation to his wife.    If this were otherwise, the statute might be rendered a dead letter at the option of the husband.    It follows, that a husband by a voluntary deed of gift of personals, in whatever form made, retains to himself the possession and enjoyment of the property during his life, and makes the gift effectual only from the time of his death, and

reserves on his own part an absolute and complete power of revoking the same, such instrument, so far as regards the distributive share of the wife, is in its nature testamentary only and can not affect the rights conferred upon her by law in contemplation of his dying either testate or intestate. In such a case the dominion of the husband over the subject continues unlimited, and the question is not varied by the circumstance, that the gift takes effect by his failing to exercise the power of revocation, for that is incidental to every testamentary disposition of property."

If this reasoning is correct, and it seems to me to be so, then a wife could not in Virginia have been defeated of her distributive share in the personal estate of her husband by any gift of it *causa mortis*. See also *Penner* v. *Jennin*, 2 Ves. 612; *Stone* v. *Stone*, 18 Ind. 389–390, and *Tucker* v. *Tucker*, 32 Mo. 464. And, if this was law in Virginia, when this opinion was delivered, it is now law in West Virginia; for the language of the statute-law, to which Judge Baldwin referred, (1 Rev. Code, ch. 104 § 26 p. 381) and the provisions of our law, (Code of W. Va. ch. 78 § 11 p. 485. Warth's Code, ch. 78 § 11 p. 577), are substantially the same, so far as this question is involved. Our law provides, that, when a husband makes any provision for a wife in his will, she may renounce such provision in a specified way and have such share of her husband's estate, real and personal, as she would have had, if he had died intestate leaving children, which is one third thereof (ch. 78 § 9 of Code of West Va. p. 485; Warth's Amended Code p. 577). As no provision was inserted in the will of Louis Seabright devising or bequeathing any property real or personal to his wife, it was of course unnecessary to entitle her to this one third of his personal estate as a distributee, that she should renounce the will. As our law is worded, it is only when a provision is made for her, that she is required to renounce such provision. In the case before us there was no gift of these bonds and notes either *inter vivos* or *causa mortis*. The testator Louis Seabright died possessed of and owning them and; after the payment of his debts the plaintiff his widow was entitled to one third of his personal estate.

For these reasons the decree of October 11, 1884, which

dismissed the plaintiff's bill, is set aside, reversed and annulled, and this Court proceeding to render such decree, as the court below should have rendered, must adjudge, that it is necessary for an account to be taken of the matters set up in the bill and amended bill, and that there are causes to surcharge and falsity the accounts of Charles W. Seabright executor of Louis Seabright; and the Court is further of opinion and so finds, that the bonds and notes mentioned and described in this bill, amended bill and commissioner's reports in this cause were a part of the estate of Louis Seabright, deceased, at the time of his death and never had been before that time delivered to the defendant Charles W. Seabright by the said Louis Seabright as a gift to the said Charles W. Seabright and Henry Seabright; and that this cause be remanded to the circuit court of Ohio with instructions to proceed with the same according to the specific directions set out in the decree of this Court and the principles laid down in this opinion and further according to the rules governing courts of equity; and that the appellant, Louisa Seabright, recover of the appellees Charles W. Seabright and Adam Ackerman, administrator *de bonis non* of Henry Seabright to be paid out of the estate in his hands to be administered her costs about her appeal in this behalf expended. The following is the decree entered by this Court :

It is therefore adjudged, ordered, and decreed, that the decree of the circuit court of Ohio county rendered in this cause on the 11th day of October, 1884, be and the same is hereby set aside, reversed and annulled, and that the appellees Charles W. Seabright and Adam Ackerman administrator *de bonis non* of Henry Seabright, deceased, out of the assets of his decedent in his hands to be administered, do pay to the appellant her costs about the prosecution of her appeal in this Court in this behalf expended ; and this Court proceeding to render such decree in this cause, as the circuit court of Ohio county should have rendered, doth adjudge, that the bonds and notes mentioned and described in the bill, amended bill and commissioner's reports in this cause were a part of the estate of Louis Seabright, deceased, at the time of his death and never had been before that time delivered to the defendant, Charles W. Seabright, by the said Louis Seabright

as a gift to the said Charles W. Seabright and Henry Sea-
bright; and the cause is remanded to the circuit court of Ohio
county with instructions to refer the cause to a commissioner
to settle the account of Charles W. Seabright as executor of
Louis Seabright, deceased, treating the *ex parte* settlement
and report of James D. Morris, commissioner of the county
court of Marshall county, confirmed at the April Term 1875,
of said court and filed with the platntiff's bill, as *prima facie*
correct liable to be surcharged and falsified by any of the
parties to this cause in the manner set out in the written
opinion of this Court, but not regarding the other *ex parte*
settlements of Charles W. Seabright, which have not been
approved by the county court of Marshall county as *prima
facie* correct; and with instructions to exclude from the said
account all items of receipts from the rent or sale of the real
estate of which Louis Seabright died seized, where such
receipts have arisen from leases or sales of said real estate
since the death of Louis Seabright, and excluding also the
commissions on said receipts and all sums paid to Mrs.
Louisa Seabright on account of dower in the home-place or
any other real estate of her husband and all other items,
which properly belong to the settlement of Charles W. Sea-
bright as agent of the heirs or of the widow to sell or rent
such real estate referred to by commissioner Morris in his
said report of September 22, 1874; excluding also from the
said account the two sums of $500.00 each paid by said
Charles W. Seabright, executor, &c., to the two specific lega-
tees, William Juergens and Henry Weidebusch, as their
legacies under the will of Louis Seabright—and this cause
is to be further proceeded in according to the principles
stated and instructions given in the written opinion afore-
said and according to the rules and principles governing
courts of equity.

REVERSED.·  REMANDED.